## ALASKA PACIFIC SALMON CO. v. REYNOLDS METALS CO.

No. 260, Docket 20555.

Circuit Court of Appeals, Second Circuit.

Sept. 18, 1947.

This is an appeal by plaintiff from a judgment, adverse to it, in an action, tried by judge and jury, for damages for alleged breach of warranty in the sale by defendant to plaintiff of laminated ply-metal boxes for use by plaintiff in packaging plaintiff's dehydrated soup mixtures.[1]

---

[1] The complaint contained a count based on fraud. This count was withdrawn.

The defendant set up a counterclaim for $7,623.67; plaintiff conceded its liability for this amount.

Plaintiff is a successful corporation, extensively engaged in the manufacture of food products for many years. It entered the soup business in 1940, making canned dehydrated soups marketed under the tradename "Minute Man."

Negotiations between Allen, representing plaintiff, and Gibbins, representing defendant, began in February 1941. Allen, on March 13, signed an order for ten million boxes, a superseding order for forty million boxes on March 15, and another superseding order for one hundred million boxes on March 17. At the trial, Allen testified that both parties knew these were not bona fide orders; Gibbins testified to the contrary.

The March 17 order reads as follows:[2]

"To Reynolds Metals Company
"Incorporated

"Central Sales Division
"1259 S. Campbell Ave.,
"Chicago, Ill.

| Western Sales Division<br>345 Ninth St.,<br>San Francisco, Calif. | | Eastern Sales Division<br>19 Rector St.,<br>New York, N. Y. |
|---|---|---|
| Customer's Order No. | Please enter our order for the following material at the prices, and on the terms stated hereon. | Date 1/17/41 |
| Ship to:<br>　Dry-Pack Corporation | Invoice to:<br>　Alaska Pacific Salmon Co.<br>　[in pencil] of Seattle Wash. | |
| Street | Street<br>　155 E. 44th Street | |
| City　　Sodus, New York | City　　New York, N. Y. | |
| Routing<br>　Cheapest Way | Terms<br>　Net 30 days | |
| | F. O. B.<br>　Our plant New York | |
| To be shipped on or about<br>　See attached instructions | Special Billing Instructions | |
| Purpose or Application of Product<br>　Packing Soup Mix | Copies of invoices required | |

[2] The parties stipulated at the trial (1) that the date "1/17/41" was a typographical error, that the correct date was March 17, and (2) that the pencil notations were added subsequent to the signing of the order.

| Quantity | Description and Size | Price |
|---|---|---|
| 100,000,000 | (one hundred million) SEAL END STYLE CONTAINERS SIZE 2⅞" wide, 3⅝" high, ⅞" deep MADE OF 15 POINT SHINY SILVER FINISH PLY METAL PRINTED—RED, WHITE AND BLUE— As per art work submitted and approved. | $5.00 per M. [in pencil] WD 1335 |

[in pencil] All in accordance with conditions set forth in our formal acknowledgment and letter of March 18, 1941
Art Work and Plates

Special Instructions and Manufacturing Remarks are to be Detailed on Reverse Side of This Form.

Machine          Hand
Application  /  /  Application

" 'Promises, understandings, and/or agreements not embodied herein, or in a separate written agreement between Seller and Buyer, are not a part of this order, and cannot become a part of any contract subsequently founded hereupon. This order is not binding upon Seller unless and until accepted by Seller on its signed Acknowledgment Copy of its Production Order hereon. This order is given by Buyer, and if accepted by Seller, will be filled by Seller upon the terms and conditions set forth on the reverse of this page which are hereby expressly made a part hereof.'

"Purchaser ALASKA PACIFIC SALMON CO.
"By JOHN M. ALLEN

"(Signed)
"HENRY GIBBINS JR.
"Salesman

"Salesman Order No. —

"OFFICE COPY"

Reverse side of order:

"Manufacturing Remarks

Finish of Metal
Paper                Embossing
Mounting
Cores                Electros
Printing
Special Instructions
Packing or Special Shipping Instructions

" 'Terms and Conditions'

"1. Seller will not be responsible for failure or delay in delivery, due to fires, strikes, breakdown, delays of carriers, limited production, or causes beyond its control, or in any event, for consequential damages to Buyer for Seller's failure or delay in delivery.

"2. When this order is accepted, delivery will be made hereunder subject to the customary commercial tolerance of 10% plus or minus in yield and quantity.

"3. It is agreed that all goods manufactured under this order, and remaining on hand at date specified for final delivery, shall be shipped and invoiced without further notice.

"4. Orders accepted are not subject to cancellation by Buyer without Seller's written consent.

"5. Any alterations called for are to be at the expense of Buyer.

"6. Seller undertakes that products sold hereunder to Buyer shall correspond to the specifications on the front hereof; and Seller hereby expressly excludes all, any,

or other, warranties, guarantees, or representations whatsoever.

"7. Advice by Seller regarding designs or wording on wrappers, cartons, labels, or on other materials sold to Buyer, which relate to products of Buyer, shall not impose any liability on Seller, or relieve Buyer of any duty, under contracts, laws or regulations relating to products of Buyer."

The previous order for 40,000,000 boxes was on the same printed form.

There was testimony at the trial as follows: In the negotiations before March 17, (a) defendant knew the purpose for which the boxes were to be used by plaintiff, knew that plaintiff required boxes which would prevent "wicking," and knew that plaintiff was relying on defendant to supply boxes suitable for that purpose; and (b) defendant had orally assured plaintiff that defendant would supply boxes which would achieve those results. There was also testimony that before March 17, defendant had made tests to ascertain whether the boxes would thus be suitable and had reported the results of those tests before March 17 to plaintiff; and that plaintiff was sufficiently satisfied with those results to make its offer of March 17, as a bona fide offer, without awaiting the outcome of further tests,[3] although the parties arranged that further tests were to be made by defendant.

On March 18, defendant wrote plaintiff a letter reading as follows: "We wish to acknowledge and thank you for your order given our Mr. Henry Gibbins, Jr., which calls for 100,000,000 seal and style Ply-Metal containers at $5.00 per thousand to be used in connection with the packaging and merchandising of your dehydrated soups. Our formal acknowledgment of your order is enclosed and the conditions of the order are supplemented as follows: (1) The conditions as set forth in our formal acknowledgment are part of the terms under which the order is accepted. (2) That since it is not possible for you to estimate the period of time wherein the entire quantity shall be produced, it will be understood that any radical increase or decrease in prevailing costs of raw materials will increase or decrease the selling price proportionately. (3) That after we get this production under way and should we devise methods or procedures that will enable us to produce this container at a cost less than originally estimated, the saving will be passed on to you. (4) That after the completion and delivery of the first ten million cartons which will be made of our regular Ply-Metal material (shiny aluminum finish inside and outside) and provided the existing demands of the United States Government on the aluminum industry have not been modified, you will accept on future productions the new Reynolds plastic finish or its equivalent as a substitute for aluminum on the outside. (5) That as long as it is possible for us to secure any aluminum, we will retain the aluminum liner on the inside of your container and no substitution will be made unless we have developed a suitable protective material for the purpose and provided you give us full permission to use the substitute; that as soon as the aluminum situation is modified to permit the general use of aluminum for domestic purposes, we will reinstate the Ply-Metal specifications with aluminum on both sides of the paper board. (6) That complete printing instructions in lots not less than 10,000,000 containers will be given us at least eight weeks before any anticipated delivery. When present day conditions are modified, this period can be reduced to four weeks. (7) That either your company or, as mentioned by you, The Bank of California of Seattle, Washington, will furnish our Credit Department with such financial information that will properly establish a credit relation to enable us to send our regular terms of net thirty days f.o.b. our plant, New York.

---

[3] Gibbins, referring to the March 17 order, testified, "Evidently there was enough information available to Mr. Allen to warrant his going ahead with the proposition as it was offered to him. * * *" Gibbins also testified that (although it was not within his province) he thought that defendant, regardless of any previous binding contract, would have made some "adjustment," had the April 18 report shown that the boxes were unsuitable for plaintiff's use.

Keep in mind it is the intention of the Reynolds Metals Company to render every cooperation and assistance necessary to help you make this venture a success. The vast facilities of this company are your assurance the Reynolds Metals Company will always be in a position to give you the finest quality workmanship and the best possible service for the least amount of money." The "formal acknowledgment" enclosed with this letter is as follows:

notify us at once. If we do not receive such notice, we will understand that you accept our interpretation of this order, and the following conditions; and we will proceed accordingly.

"Conditions

"1. Seller will not be responsible for failure or delay in delivery, due to fires, strikes, breakdowns, delay of carriers, limited production, or causes beyond its con-

"REYNOLDS METALS COMPANY
"(A Delaware Corporation)
"General Offices

| Date of Order | Customer's Order No. | Invoice No. |
| 1/17/41 | WD-1335 | Date March 18, 1941 |

Sold to: ALASKA PACIFIC SALMON CO. OF SEATTLE, WASH.
155 East 44th Street
New York, N. Y.

Shipped to
and
Destination: DRY-PACK CORPORATION
Sodus, New York. From New York

Expect to ship | 10,000,000 as soon as possible, balance as instructed. | F. O. B. Our Plant

How Shipped |
| Via: Cheapest way | Prepaid 148547-20203 Net 30 Days

Car No. & Route |

| Quantity Ordered | Unit | Description | Cases | Shipped Quantity | Price Unit | Amount |
| --- | --- | --- | --- | --- | --- | --- |
| 100,000,000 | | Seal end style containers—Size—2-7/8 x 7/8 x 3-5/8" printed red, white and blue on shiny silver 15 point ply metal board, all in accordance with conditions set forth in our formal acknowledgment and letter of March 18th, 1941. | | | $5.00 | Per M |
| | | Design as per art work submitted and approved | | | | |

| Credit | Written By | Checked By | Invoices Req. | Corre | Salesman | Electrios |
| --- | --- | --- | --- | --- | --- | --- |
| WLP | FB/JA | FB | 2 | 4 | Gibbins | and dies to be made. |

"We acknowledge with thanks the receipt of your above order, which has been entered in accordance with your specifications; and this is an exact copy of our entry of said order. If not correct, please

trol, or in any event, for consequential damages to Buyer for Seller's failure or delay in delivery.

"2. When this order is accepted, delivery will be made hereunder subject to the

customary commercial tolerance of 10% plus or minus in yield and quantity.

"3. It is agreed that all goods manufactured under this order, and remaining on hand at date specified for final delivery, shall, at the option of Seller, be shipped and invoiced without further notice.

"4. Orders accepted are not subject to cancellation by Buyer without Seller's written consent.

"5. Any alterations called for are to be at the expense of Buyer.

"6. Seller undertakes that products sold hereunder to Buyer shall correspond to the above specifications; and Seller hereby expressly excludes all, any, or other, warranties, guaranties, or representations whatsoever. Seller's liability hereunder shall be limited to replacement of any defective material.

"7. Advice by Seller regarding designs or wording on wrappers, cartons, labels, or on other materials sold to Buyer, which relate to products of Buyer, shall not impose any liability on Seller, or relieve Buyer of any duty, under contracts, laws or regulations relating to products of Buyer. "Yours very truly,
"REYNOLDS METALS COMPANY
"Federal Reserve Bank Bldg.,
"Richmond, Virginia
"By (s) F. A. Sunderhauf

"Seller shall not be responsible for failure or delay in delivery due to preference given to orders of the United States Government, any instrumentality thereof, or for national defense."

On April 7, plaintiff wrote defendant as follows: "Will you please make the following corrections on our current order for MINUTE MAN cartons. * * *" The letter went on to direct changes in the wording of the labels on the boxes.

On April 18, Sunderhauf, one of defendant's officers, wrote plaintiff as follow: "I am enclosing a copy of a Laboratory report handed us by the Reynolds Research Corp. in connection with the Ply-Metal tests which they have conducted for the past thirty eight days. You will note that

as far as the noodle soup mix is concerned, the Ply-Metal containers sealed with both the #49 adhesive, as well as the hot melt type adhesive which will be used on your automatic unit were absolutely satisfactory, and under the same test conditions, your present metal envelope containing noodle soup mix also proved satisfactory. This condition, however, was not true in connection with the vegetable soup mix. Practically every one of these envelopes leaked, but the Ply-Metal container sealed with both the cold adhesive, as well as the hot melt adhesive, was satisfactory in every way. It will also interest you to know, as evidenced by the enclosed samples, that the inside of the Ply-Metal container did not develop any corrosion or contamination of any kind and that the wick action of the exposed paper board edge on the inside was practically nil; in other words, it appears the Ply-Metal container will give you the maximum protection you can hope to get for your dehydrated soup products. We are continuing our research in connection with this package and will subject the Ply-Metal container to other tests after which we will give you another report.
"Very truly yours,
"REYNOLDS METALS COMPANY,
"F. A. Sunderhauf
"General Mgr.,
"FAS:CCC "Display & Container Division."

Enclosed with this April 18 letter were copies of the following reports:

"Reynolds Research Corporation,
"Central Avenue,
"South Kearney, N. Y.
"Mitchell 2-1566
"April 17, 1941
"Mr. F. A. Sunderhauf,
"25th St. Office
"Re: Skinner & Eddy [4]
"Dear Mr. Sunderhauf:
"As per your request, we have conducted packaging tests to determine the relative packaging quality of Reynolds' ply-metal containers in relation to Skinner & Eddy Corporation's current 'Minute Man Soup Mix' foil paper pliofilm bag and are accord-

---

[4] Skinner & Eddy Corporation, brokers, handled plaintiff's sales. Skinner was president of plaintiff and vice-president of Skinner & Eddy Corporation.

ingly attaching our formal laboratory report covering same. As can be noted from our report, Reynolds' ply metal containers showed themself to be a very satisfactory packaging medium after a thirty-eight day period under conditions of 120° F. and 25% relative humidity. Although the above period of time indicates that Reynolds' containers will be satisfactory, we are, nevertheless, continuing this investigation with the same packages and shall accordingly pass on another report to you within thirty days.

"Very truly yours,

"O. K. SCHMIED"

"Reynolds Research Corporation,
"Reynolds Metals Research Division.
"Date: 4/17/41
"Expt. No. Oj-174

"To: Mr. F. A. Sunderhauf
"Subject: Skinner & Eddy Corp. 'Soup Mix'

"OBJECT:
"To investigate the relative packaging qualities of Reynolds' ply metal containers in relation to subject's Minute Man, foil paper pliofilm bag.

"PROCEDURE:
"Ten Reynolds' ply metal containers were filled with 'Minute Man Noodle Soup Mix' and sealed, five with #49 adhesive, five with hot metal adhesive, under F. A. Sunderhauf's direction. The above Reynolds' ply metal containers were placed on sheets of bond paper in the 120° F., 25% relative humidity cabinet to be observed for grease stains on the bond paper.

"Three Skinner & Eddy 'Minute Man Noodle Soup Mix' envelopes and three 'Minute Man Vegetable Soup Mix' envelopes were placed on bond paper in the 120° F., 25% relative humidity cabinet in order that any fat leaks would show as a stain on the bond paper.

"RESULTS:
"After a period of 38 days under conditions as described above, the following observations were made:

"Leakage of Fat from Packages
"Minute Man Noodle Soup Mix

"Reynolds' Ply Metal Containers—no leakage on bond paper (#49 adhesive)

"Reynolds' Ply Metal Containers—no leakage on bond paper (Hot Melt adhesive)

"Envelopes—No leakage on bond paper."

Allen testified that, shortly after the receipt of defendant's April 18 letter and the accompanying reports, he told defendant to proceed to manufacture the boxes.

Some of the boxes shipped by defendant were received and accepted by plaintiff about May 2, and others subsequently. Payments by plaintiff to defendant were completed in October. About that time, as a result of complaints from its customers, plaintiff discovered that the boxes were not fit to hold plaintiff's soup because a wicking action developed in them which caused discoloration and rancidity of the soup.

The judge's charge to the jury was in part as follows:

"Members of the jury, this is an action for damages for alleged breach of warranty in the sale by the defendant to the plaintiff of a large quantity of laminated ply-metal boxes for use by the plaintiff in packaging the plaintiff's dehydrated soup mixtures which were being marketed throughout the country under the trade name of Minute Man. The complaint as originally drawn contained two separate causes of action, one based on warranty, and the other on fraud. As already stated to the jury, the cause of action based on fraud has been withdrawn by the plaintiff, leaving only for determination the single cause of action for breach of warranty. At the outset I should like briefly to explain to you what the pleadings contain, for, in the first instance, those pleadings do define the issues which are to be tried in the action. The complaint alleges in substance in this remaining cause of action that the defendant represented that it had conducted laboratory tests which demonstrated the fitness of the boxes for the purpose of packaging the plaintiff's dehydrated soup mixtures, that the plaintiff relied on these representations and on the skill of the defendant in planning and manufacturing such boxes, and that as a result of this reliance the plaintiff in or about April 1941 entered into an agreement with the defendant whereby the plaintiff agreed to purchase 10 million of the boxes at a price of

$5 a thousand. It is then alleged that pursuant to the agreement the plaintiff purchased a total of 11,553,450 boxes for which the plaintiff paid the full invoice price of $57,767, and that the plaintiff packaged 3 million of the boxes with its dehydrated soup mixture and began shipments to its customers throughout the United States. It is further alleged that commencing in August 1941 complaints from customers regarding the soup mixtures were received, and on investigation it was found that the boxes were unfit for the purpose for which they were sold to the plaintiff, and were not free from latent defects in manufacture and material. The balance of the pleading is devoted to allegations regarding the damage claimed to have been sustained by the plaintiff in recalling the boxes which had previously been sent out and for the losses claimed to have been suffered by the plaintiff. The answer of the defendant denies that the agreement was as stated in the complaint, and alleges affirmatively that in March 1941, the parties entered into a contract by which the defendant agreed to sell and deliver and the plaintiff agreed to purchase, 100 million laminated metal foil boxes at $5 a thousand. The answer admits that the defendant delivered and the plaintiff accepted 11,553,450 boxes for which the plaintiff paid $57,767. In other respects the answer is in substance a general denial, and it sets up a counterclaim for $7,623.67 for the agreed price of a quantity of what are called DW envelopes supplied to the plaintiff by the defendant between November 1941 and February 1942. The plaintiff has conceded liability for the payment of this sum of $7,623.67 asserted in the counterclaim.

"It will be seen from this summary of the pleadings that the two main issues in the case are first, whether the agreement between the parties was as alleged by the plaintiff or whether it was as alleged by the defendant, and second, whether the warranties as alleged by the plaintiff were made by the defendant and were relied upon by the plaintiff and if so, whether these warranties were breached by the defendant to the damage of the plaintiff. It will, I think, be helpful to explain the meaning of this term 'warranty' which has been used throughout the trial, and I doubt if I can do anything better than to quote to you from provisions of the Uniform Sales Act, which is a statute adopted by New York and a large number of other states in the United States. These provisions have already been stated to you, but I think they perhaps will bear repeating. The Act defines an express warranty as follows, and I quote: 'Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods and if the buyer purchases the goods relying thereon.' This Act also states the circumstances under which an implied warranty, that is, a warranty implied by law, of fitness for a particular purpose arises as follows, and again I quote: 'Where the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.' The plaintiff, as I understand it, relies on both express and implied warranties. This brings me to the first issue I have already indicated, namely, whether the agreement between the parties was as alleged by the plaintiff or whether it was as alleged by the defendant, and I am leaving that issue to the jury to determine as a question of fact on all the evidence in the case. The issue is a critical one because both the order of March 17 and the acknowledgment of March 18 contain a clause to the effect that the product sold shall correspond to the prescribed specifications, and that all other warranties whatsoever are by the terms of the clause expressly excluded. This is what has been referred to during the course of the trial as a disclaimer of warranty. The testimony on the issue with respect to the agreement has taken a wide range and I shall not attempt to review it in any detail. The negotiations between the parties commenced in February 1941, and were for the most part conducted by Gibbins and Allen. There is a conflict in the testimony of these two men regarding the three orders, one

for 10 million boxes on March 13th, another for 40 million boxes on March 15th, and a third for 100 million boxes on March 17th. Gibbins insisted that these orders were actual bona fide orders, and you have heard the testimony which he gave on that subject. Allen on the other hand said in substance that they were merely scenery for use in obtaining priorities for aluminum. The question between these two witnesses is one of credibility which must be determined by the jury on all the evidence in the case, and there is little that I care to say or should say on that subject. It is entirely for the jury to determine for themselves. The order of March 17th for 100 million boxes was acknowledged by the defendant on March 18th in a formal instrument which provided with respect to shipment, for the shipment of 10 million as soon as possible, balance as instructed. And this order also contained a provision which I quote: 'All in accordance with conditions set forth in our formal acknowledgment and letter of March 18th, 1941.' The letter referred to injected new conditions or new provisions in the previous order of March 17th, and I think it is clear, therefore, that up to this point there was no binding agreement between the parties. After March 18th Gibbins and Allen appear to have been in almost daily contact, and on April 18th or 19th the Sunderhauf report dated April 18th with its accompanying Schmied letter and laboratory report were received and read by Allen. Allen testified that on the day he received the report or on the following day, he notified Gibbins to go ahead and manufacture 10 million boxes. Broderick, the Reynolds production manager, testified that in the meantime he had made preparations for making the boxes and had in fact released the order for production on March 21st. The first invoice of boxes delivered to the plant at Sodus is dated April 24th, and further invoices were rendered as additional boxes were delivered. All these invoices were, as I have already stated, paid in full. I now revert to the acknowledgment of the 100 million order dated March 18th, with its accompanying letter containing new conditions. This acknowledgment with its new conditions constituted a counter-offer by the defendant which required an acceptance by the plaintiff to make it effective. Was there such an acceptance by the plaintiff? There is no evidence that I recall in the case that the plaintiff accepted the counter-offer, either orally or in writing, but acceptance may be inferred by the jury from the plaintiff's conduct. The defendant points to the plaintiff's receipt of ten million of the boxes and payment therefor as evidence by conduct of this acceptance. This, if it stood alone, would be sufficient to indicate acceptance of the counter-offer by the plaintiff. But the plaintiff asserts that in April, 1941, the parties entered into an entirely new oral agreement for the sale of 10 million boxes at $5.00 a thousand. The reference is apparently to the oral direction given by Allen to Gibbins on April 18th, 19th or 20th which I have already referred to, and it is asserted by the plaintiff that this direction together with the previous negotiations constituted the agreement which is alleged in the complaint. It was, of course, possible for the parties to make an oral agreement, and by possible, I mean legally possible, in April, 1941, as the plaintiff asserted, but the question is whether the parties did so, and that is a question for the jury to determine on all the evidence in the case.

"If the jury finds that there was no such agreement it would I think have to find that the agreement was or is as embodied in the order and acknowledgment with the new conditions of March 17th and March 18th. In other words, I think that if the jury should exclude the agreement which the plaintiff asserts, it necessarily would have to fall back on the agreement asserted by the defendant, and to find that the plaintiff had by conduct accepted the new conditions in the acknowledgment. And if the jury does so find, I think it would follow that the jury must find a verdict for the defendant because of the disclaimer clause appearing in those documents. If, however, the jury finds that there was such an agreement, as the plaintiff asserts, it will then be necessary for the jury to consider whether or not the defendant warranted either expressly or impliedly, the fitness of the boxes for packaging the plaintiff's dehydrated soup mixtures. The plaintiff points to the

statement in the Sunderhauf report of April 18th with its accompanying papers as showing an express warranty of the fitness of the boxes for this purpose. It also points to plaintiff's reliance on the skill and judgment of the defendant as giving rise to an implied warranty in this respect. If you find that either of these warranties was made and that the defendant's boxes failed to measure up to the warranty, you will then come to the question of damages."

At the end of his charge, the judge said: "Are there any exceptions or requests to charge? And I may say in that connection that I have examined the requests submitted by counsel and I have indicated on the margin my disposition of them, most of which I think have been substantially covered in what I have stated to the jury, and if counsel wishes me to charge any of the requests which I have indicated that I have allowed, I am perfectly willing to do so." There was no response from plaintiff's counsel.

The following are the plaintiff's written requests to charge, together with the written notations of the judge with respect thereto:

"1. If the jury believes that Reynolds knew the purpose for which Alaska intended to use the cartons and further knew that Alaska was relying on Reynolds to produce cartons that would be suitable for that purpose, and if Alaska did in fact rely on Reynolds to supply such cartons, then Reynolds assumed an obligation to deliver cartons that would be suitable for the purpose of packaging Alaska's soups, unless Reynolds expressly disclaimed this obligation. (Allowed)

"2. If the jury believes that Reynolds assured Alaska or stated as a fact that the boxes were suitable or satisfactory for the purpose of packaging Alaska's soups, and Alaska relied on such statements by Reynolds, then Reynolds assumed the responsibility for the delivery of packages which would be suitable for Alaska's soups, unless such responsibility was expressly disclaimed by Reynolds. (Allowed)

"3. If Reynolds either stated as a fact or represented in any way that the ply-metal boxes were satisfactory for the pur-pose of packaging Alaska's soups and did not expressly disclaim responsibility for the furnishing of boxes which would be satisfactory for Alaska's soups, then, if Alaska relied on the statements or representations, the question of whether Reynolds intended in making these statements or representations to assume responsibility for the furnishing of boxes which would be suitable is immaterial, and, as a matter of law, Reynolds was obligated to furnish such boxes. (Refused except as charged.)

"4. As a matter of law, the 100-million box order of March 17th, 1941, did not constitute a or the contract between the parties. (Allowed.)

"5. As a matter of law, the order of March 17th, 1941 for 100 million containers plus the acknowledgment letter and acceptance of March 18th did not constitute a or the contract between the parties. (Allowed.)

"6. If the jury believes that Allen and Gibbins had a conversation after Allen had received Sunderhauf's letter of March 18th and the printed acknowledgment enclosed therewith, and if the jury believes that the conversation was substantially as testified to by Allen, then, as a matter of law, there was no disclaimer by Reynolds of any obligation to furnish boxes which would be suitable for the purpose of packaging Alaska's soup mixes. (Refused.)

"7. If the jury finds that the delivery of the boxes by Reynolds and the acceptance of the boxes by Alaska took place after Alaska received the letters and laboratory reports of April 17th and 18th and if the jury further finds that Reynolds knew the purpose for which the boxes were to be used and that Alaska was relying upon Reynolds to supply boxes which would be suitable for that purpose, then Reynolds assumed, as a matter of law, an obligation to furnish boxes which would be suitable. (Refuse to amplify charge in this respect.)

"8. If the jury believes the testimony of either Allen or Irvine as to the conversations which took place with either Gibbins or Sunderhauf contemporaneously or immediately after Sunderhauf's letter and report of April 16th and 18th, then, as a matter of law, there was no disclaimer by

Reynolds of responsibility for the furnishing of boxes which would be suitable for the packaging of Alaska's soup mixes and, as a matter of law, such a responsibility devolved upon Reynolds. (Refuse to amplify charge in this respect.)

"9. Plaintiff's Exhibit 16—the order of March 17th for 100 million boxes—does not in and of itself constitute a contract. It was an offer and until accepted by Reynolds could not become a contract. I charge you further that plaintiff's exhibits 17 and 18, being the letter of acknowledgment signed by Sunderhauf and the printed form of acknowledgment, varied the terms of the offer and did not constitute a contract. The letter of acknowledgment and the printed acknowledgment itself constitute a counter-offer which in order to become a contract had to be accepted by Alaska in the precise terms of that counter-offer. There is no evidence that Alaska either orally or in writing accepted this counter-offer of Reynolds. If the essential terms of the contract were never agreed to by both Reynolds and Alaska, that is, that the minds of the parties did not meet on all the essential terms, but Reynolds knew the purpose for which the box was to be bought and that Alaska was relying upon Reynolds to furnish a box which would be suitable for that purpose, then, as a matter of law, Reynolds assumed the obligation to furnish such a box. (Refuse to amplify charge in this respect.)

"10. If the jury finds from all the evidence in the case, including the testimony of all the witnesses and all the documents, including orders, letters and reports, that Reynolds agreed to deliver packages which would be suitable for the packaging of Alaska's soups, and if the jury finds that the packages were not suitable, then the jury must return a verdict for the plaintiff. (Refuse to amplify charge in this respect.)

"The failure of the defendant to call the witnesses Sunderhauf and Schmied may be considered by the jury to give rise to the inference that if called as witnesses their testimony would have been unfavorable to defendant's contentions."

Plaintiff excepted to all refusals to charge as requested. The jury having returned a verdict in favor of the defendant, the judge, after denying plaintiff's motion for a directed verdict [5] or in the alternative for a new trial, entered judgment for the defendant dismissing plaintiff's complaint on the merits.[6]

Section 93 of the New York Personal Property Law, Consol.Laws, c. 41, § 12 of the Uniform Sales Act, reads as follows:

*"Definition of express warranty*

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

Section 96, subd. 1 of that New York Statute, § 15(1) of the Uniform Act, reads as follows:

*"Implied warranties of quality*

"1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

Section 152, § 71 of the Uniform Sales Act, reads as follows:

*"Variation of implied obligations*

"Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived, or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

Julian S. Bush, of New York City (Kenneth M. Spence and Soia Mentschikoff, both of New York City, and Thomas L. Howe,

---

[5] Plaintiff had previously so moved at the close of the evidence.

[6] The Court entered judgment on defendant's counterclaim.

of White Plains, N. Y., of counsel, for plaintiff-appellant.

Medina & Sherpick, of New York City (Harold R. Medina and William Gilbert, both of New York City, and William S. D. Woods, of Richmond, Va., of counsel), for defendant-appellee.

Before CHASE, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Plaintiff complains that the judge erred in (1) denying its motion for a directed verdict, (2) in his charge to the jury, (3) in refusing some of plaintiff's requests to charge, and (4) in excluding certain documents. We shall consider these alleged errors in turn.

1. *Denial of plaintiff's motion for a directed verdict.*

The first question is whether, on the indisputable record facts, plaintiff was entitled to a directed verdict based upon proof of facts creating an express warranty, pursuant to § 93 of the New York Personal Property Law, or an implied warranty, pursuant to § 96, subd. 1 of that statute.

■ We shall assume that the indisputable record facts demonstrate the following: (1) After negotiations between the parties, plaintiff made an offer, in the form of an order, on March 17, 1941, to purchase 100,000,000 boxes from defendant. (2) Defendant, by its letter of March 18 and the enclosed "formal acknowledgment," made a counter-offer. (3) Plaintiff's letter of April 7 was an acceptance, by conduct, of defendant's counter-offer. (In considering the motion, this must be taken as a fact, because a jury might reasonably so have found; accordingly, in this context, we disregard as irrelevant defendant's April 18 letter and the accompanying reports, but we will consider them in point 2, infra, dealing with the judge's charge.) (4) The negotiations prior to March 17 would have given rise to an implied warranty,[7] unless the counter-offer contained a disclaimer provision effectively precluding such warranties. Thus the question boils down to that of the legal effect of the so-called disclaimer clause.

The counter-offer was based upon, although it modified, plaintiff's order of March 17. On the face of that order, under the printed caption, "Purpose or Application of Product," were the typewritten words, "Pack dehydrated soups." Also on the face of the order, in printed type, was the statement that the order was subject to "the terms and conditions set forth on the reverse side of this page which are hereby expressly made a part hereof." On the reverse side, under the caption, "Terms and Conditions," item 6 stated, in printed type, "Seller undertakes that products sold hereunder shall correspond to the specifications on the front hereof; and Seller hereby expressly excludes all, any, or other warranties, guaranties, or representations whatsoever." Substantially that same item (the "disclaimer") was printed on the face of defendant's "formal acknowledgment" of March 18 which was enclosed with and referred to in defendant's March 18 letter; and that letter called specific attention to the conditions set forth in the enclosed "acknowledgment," although that letter also said that the boxes were to be used for the "packaging and merchandising of your dehydrated soups."

■ All the printed matter in these documents is easily readable, even to our aging eyes. We think the statement of "Purpose or Application" in the order was not part of the "specifications," and thus not within the sole named exception to the disclaimer clause. On the facts before us in connection with the directed-verdict-motion (i. e., omitting all consideration of defendant's April 18 letter and of the judge's charge and plaintiff's requests to charge), we think the disclaimer effectively "negatived" the asserted implied warranty, and that therefore the judge correctly denied that motion. Our reasons follow.

■ We shall assume that the facts, absent the disclaimer, would have given rise to an implied warranty of fitness for plaintiff's particular use, pursuant to § 96-1.

---

[7] Perhaps the indisputable facts do not justify that conclusion, but we assume its correctness arguendo.

If so, it would have arisen "by implication of law." That is the phrase used in § 152. Pursuant to that section, businessmen are at liberty to contract away rights and obligations which would arise under such an implied warranty. Lumbrazo v. Woodruff, 256 N.Y. 92, 97, 175 N.E. 525, 75 A.L.R. 1017; Burntisland Shipbuilding Co. v. Barde Steel Products Corporation, D.C., 278 F. 552, 554; Sharples Separator Co. v. Domestic Electric Refrigerator Corporation, 3 Cir., 61 F.2d 499, 501; Minneapolis Threshing Machine Co. v. Hocking, 54 N. D. 559, 209 N.W. 996; Ford Motor Co. v. Cullum, 5 Cir., 96 F.2d 1, 3, certiorari denied 305 U.S. 627, 59 S.Ct. 89, 83 L.Ed. 401; cf. Advance-Rumely Thresher Co. v. Jackson, 287 U.S. 283, 288, 53 S.Ct. 133, 77 L.Ed. 306, 87 A.L.R. 285; Hopkinsville Motor Co. v. Massie, 228 Ky. 569, 15 S.W. 2d 423, 424; 32 Illinois Law Review (1938) 938, 950; Corbin, The Parol Evidence Rule, 53 Yale Law Journal (1944) 603, 621.

Plaintiff argues that, although other kinds of implied warranties may be excluded by a general disclaimer, the implied warranty of fitness for use (§ 96-1) has such peculiar importance that it cannot be avoided by a general disclaimer not specifically brought to the buyer's attention. We doubt the soundness of that distinction.[8] It is noteworthy that Llewellyn, a distinguished commentator on the "law of sales," suggests a quite different classification.[9] He thinks the courts should accord special dignity to an implied warranty in a "sale by description" under § 14 of the Uniform Act, § .95 of the New York statute,[10] as distinguished from warranties which he considers of less dignity such as (1) implied warranties of "fitness for use" and "merchantability" under § 15(1) of the Uniform Act, § 96, subd. 1 of the New York statute, and (2) "express warranties" under § 12 of the Uniform Act, § 93 of the New York Act.[11] However that may be, plaintiff's contention lacks pertinence here: As previously noted, defendant's letter of March 18 specifically called plaintiff's attention to the "conditions" contained in the enclosed "acknowledgment," one of those "conditions" being the disclaimer.

█ Although it has withdrawn its claim of fraud and asserts no illegality, accident or mistake, plaintiff, citing Lumbrazo v. Woodruff, 256 N.Y. 92, 175 N.E. 525, 75 A.L.R. 1017, and Morris Run Coal Co. v. Carthage Sulphite Pulp & Paper Co., 210 App.Div. 678, 206 N.Y.S. 676, affirmed 242 N.Y. 567, 152 N.E. 430, urges that the New York courts hold invalid a disclaimer where there is "unfair dealing" or where the disclaimer, if held effective, would produce a result "contrary to natural justice" or "good morals." Assuming that to be the New York rule, on the facts here considered, it is inapposite. Because we think the disclaimer provision not ambiguous, we

---

[8] Cf. Bagley v. General Fire Ext. Co., 2 Cir., 150 F. 284; Lasher Co. v. La Berge, 125 Me. 475, 135 A. 31; Corbin, Parol Evidence Rules, 53 Yale L.J. (1944) 603, 621, but, see, perhaps, contra, Little v. G. E. Van Syckle & Co., 115 Mich. 480, 73 N.W. 554; Schuler v. Union News Co., 295 Mass. 350, 4 N. E.2d 465.

[9] Llewellyn, On Warranty of Quality, and Society, 37 Col.L.R. (1937) 341, 387.

[10] He calls it an "Iron Section" the legal consequences of which he thinks the courts should not permit the seller to avoid by a disclaimer.

[11] The parties to an agreement may validly provide that the entire agreement is to have no legal consequences; see Smith v. MacDonald, 37 Cal.App. 503, 174 P. 80; Rose and Frank Co. v. J. R. Crampton & Bros., Ltd., [1923] 2 K. B. 271 [1945] A. C. 445; cf. Kind v. Clark, 2 Cir., 161 F.2d 36, 46. Presumably, in most instances, parties can similarly agree as to a particular provision.

It may well be, however, that, recognizing that "adult persons of sound mind," dealing at arm's length, may ordinarily bargain away their rights, but fearing that it might possibly be argued that no obligations arising by "operation of law" could be contracted away, the draftsmen of § 152 felt it desirable to anticipate and dissipate that argument; cf. 32 Ill.L.R. (1938) 938, 949-950.

Of course, the courts do not allow a party to "contract out" of some kinds of rights created by statute; see e. g., Brooklyn Saving Bank v. O'Neil, 324 U. S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296. But, in the light of § 152, there is no reason to place within that category the rights under the implied warranty asserted by plaintiff here.

regard as not in point such cases as O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 55, 19 N.E.2d 676 and White v. Hoyt, 73 N.Y. 505, 511.

We find nothing in the undisputed evidence of what occurred, up to and including April 7, which constituted an express warranty.[12] Accordingly, since anything in the nature of an implied warranty was negatived by the disclaimer, plaintiff's motion for a directed verdict was properly denied.

### 2. Alleged error in the judge's charge.

Up to now, in considering the motion for directed verdict, we have discussed the case on the basis that—as the jury might have found—plaintiff on April 7 accepted defendant's counter-offer. We now turn to the judge's charge, which properly discussed events occurring after April 7 (including plaintiff's receipt of defendant's April 18 letter and the accompanying reports of tests made by defendant), ignored in the previous part of this opinion. In this connection,

---

[12] I differ from my colleagues as to the road to this conclusion. I think, but my colleagues do not, that, absent the disclaimer clause, the first and the last two sentences of defendant's March 18 letter would have been a promise to supply goods fit for plaintiff's use, and that this fact, plus plaintiff's purchase of the goods, would have constituted an express warranty pursuant to § 93 of the New York Statute.

I am thus brought face to face with plaintiff's sweeping contention that no sort of express warranty can validly be negatived, a contention the soundness of which I incline to doubt. For obligations under at least some types of express warranties probably arise by "implication of law". See Williston, Sales (2nd Ed.) s. 197; Williston, Contracts (Rev. Ed.) ss. 643, 673, 970, 1505, 1506; Sayeg v. Gloria Light Co., 236 App.Div. 761, 259 N.J.S. 492; Bowser & Co., Inc., v. McCormack, 1930, 230 App.Div. 303, 305, 243 N.Y.S. 442; International Harvester Co. of America v. Jeffries, Mo.App., 4 S.W.2d 501; Miami Lime & Chemical Co., Inc., v. York Ice Machinery Corporation, 5 Cir., 104 F.2d 312; cf. O. S. Stapley Co. v. Newby, 57 Ariz. 24, 110 P.2d 547, 549; Valley Refrigerator Co. v. Lange Co., 242 Wis. 466, 8 N.W.2d 294, 297, 298; Corbin, The Parol Evidence Rule, 53 Yale Law Journal (1944) 603, 621.

If such obligations do arise by "implication of law", they can perhaps be negatived pursuant to § 152 of the New York Statute. To be sure, Llewellyn, chief architect of the draft of the proposed revised Sales Act, referring to one of its sections which reads, "If the agreement creates an express warranty, words disclaiming it are inoperative", indicates that it and related matter in the draft cover, inter alia, § 12 of the present Uniform Sales Act, i. e., 93 of the New York Act, "and the better case law thereunder". Uniform Revised Sales Act,

Proposed Final Draft No. 1, 1944, § 41 (1) and comment, p. 142. But earlier, referring to the existing Act, he had said in 37 Col.L.Rev. at 387 that "the easiest of all warranties to negate are those labelled 'express' * * *". And a provision of the new proposed Act, not yet enacted by the New York Legislature, is scarcely authoritative in construing the present New York statute.

But plaintiff need not rely on its sweeping contention. For here, if there is an express warranty, it rests on a promise contained in and forming part of the contract; and, no matter what may perhaps be true of other kinds of express warranty, I think that obligations under such a warranty do not arise by "implication of law" and that, therefore, § 152 is here irrelevant.

However, whether there is such a promise is a matter of interpretation of all the language of the contract. The contract (as we must view it on this motion) contains not only the three sentences above mentioned but also the disclaimer clause; reading the contract as a whole, I conclude that defendant made no such promise. In other words, I believe, not that the disclaimer negatived an obligation, under an express warranty, which, absent the disclaimer, would have arisen by "implication of law," but that a correct interpretation of the entire contract shows that defendant did not promise to furnish goods fit for plaintiff's use.

To avoid any possible misunderstanding, I repeat that my colleagues do not associate themselves with what I have said in this footnote. Judge Chase thinks that, on the facts here, there is no need to consider the effects of disclaimers of express warranties of any sort. Judge Clark goes further. He disagrees with my suggestion that perhaps certain types of express warranty may be disclaimed. He does not accept my reading of the authorities cited in this

our earlier discussion of warranties is irrelevant, as the judge's charge on that subject was correct, except as noted below.

Plaintiff in its complaint alleged that it had entered into the agreement with defendant in April.[13]  In support of this allegation, plaintiff introduced testimony to the effect that the agreement was made shortly after plaintiff's receipt of, and in reliance upon, defendant's April 18 letter and the accompanying reports.  In the closing argument of plaintiff's counsel to the jury, he took that position, saying that the agreement was made when Allen, the day or the day after he received the April 18 letter, told defendant to proceed to manufacture the boxes.

The judge instructed the jury, in effect, as follows: (1) If they found that such an agreement was made on or shortly after April 18, then they must ignore the disclaimer and must find for plaintiff (subject to determination of damages), if they also found the facts (described by the judge[14]) necessary to constitute an express or implied warranty.  (2) If the jury found there was no such agreement at that time, then they must find that the March 18 counter-offer was accepted by plaintiff's conduct, with the consequence that the disclaimer was effective, and they must then find for the defendant.

Plaintiff now argues that that part of the charge summarized in (2) just above was erroneous for this reason:  Even if (contrary to plaintiff's position at the trial) no agreement was made on or shortly after April 18, nevertheless the disclaimer would have been ineffective and plaintiff would have established a warranty, if the jury had found—as they might have found under proper instructions—that plaintiff accepted the counter-offer by conduct at any time after plaintiff's receipt of the April 18 letter and accompanying reports, and that plaintiff relied thereon when it thus accepted that counter-offer.[15]

We agree that the charge was thus in error.  But, on this appeal, we will not consider that error.  Ordinarily, even a general exception to a charge is not sufficient.  Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719.  Here there was not even a general exception:  When the judge, at the close of his charge, explicitly invited counsel to state any exceptions, plaintiff's counsel maintained silence, contenting himself with an exception to the judge's refusal to allow certain of plaintiff's requests to charge.[16]  This was the equivalent of saying to the judge: "Plaintiff has no suggestions for correction of your charge other than those contained in plaintiff's requests to charge."

footnote.  He concludes, however, that, entirely without regard to the disclaimer clause, nothing in defendant's March 18 letter would have constituted an express warranty.

[13] The complaint alleged: "7.  As a result of its reliance on said representations by Reynolds, Alaska in or about April, 1941, entered into an agreement with Reynolds whereby Alaska agreed to purchase 10 million of said laminated metal foil boxes at $5 per thousand boxes.  Reynolds agreed to deliver said boxes and further agreed and stipulated that such boxes would be fit for the purpose of packaging the dehydrated soup mixtures manufactured by Alaska. * * * 10.  Thereafter and pursuant to the agreement set forth in paragraph 7 hereof, Reynolds delivered and Alaska accepted a total of 11,557,450 boxes, for which Alaska paid the full invoice price of $57,767, and Alaska has otherwise duly performed all the conditions on its part to be performed under said agreement."

[14] See also discussion infra of plaintiff's requests to charge Nos. 1 and 2.

[15] On this appeal, plaintiff contends that the agreement was made not in April but on May 2, when plaintiff first accepted some of the boxes.  The acceptance of the boxes, says plaintiff, constituted acceptance by conduct of the counter-offer supplemented by the April 18 letter and those reports.

In one sentence of the judge's charge, he said that plaintiff asserted that the parties, in April, entered into an "entirely new agreement."  Presumably because the agreement asserted at the trial by plaintiff was not a "new" agreement, but the agreement, plaintiff now argues that the judge's remark was prejudicially erroneous.  We think the argument captious.

[16] This silence may have been due to the position, noted above, which he took at the trial, i. e., that the contract was made in April, shortly after receipt of the April 18 letter.

Consequently, plaintiff is now barred from asserting the error in the charge (since it is not the egregious kind of error we may consider of our own motion[17]), unless the judge erred in refusing some of those requests or some of them served to call the judge's attention to that error in his charge.

3. *Alleged errors in refusing requests to charge.*

■ The judge marked "'allowed" on plaintiff's requests to charge Nos. 1, 2, 4 and 5. We see no error in his refusal of the other requests, as they either had already been covered by the charge or contained defects which were slight and unimportant.

■ (a) As the judge offered to give plaintiff's requested charges Nos. 1 and 2, should plaintiff's counsel so desire, we must treat the case as if they had been given. They cover everything contained in denied requested charge No. 3 except for the statement in No. 3 that defendant's intent to assume responsibility was immaterial. That statement was clearly implied in requested charges Nos. 1 and 2 and in the judge's charge. (b) Plaintiff's requested charge No. 6 would have had the judge tell the jury specifically to consider Allen's testimony concerning his conversation with Gibbins just after Allen had received defendant's March 18 letter and the enclosed "acknowledgment." [18] In this segment of Allen's testimony, he did not (as plaintiff suggests in its brief) [19] state that he rejected defendant's counter-offer. He testified that he had then said to Gibbins that he could not understand defendant's "acknowledgment" of plaintiff's 100,000,000 order, as both he and Gibbins knew that that order was not bona fide but a collusive sham device, in obtaining priorities for aluminum, to deceive the national government. The judge in his charge had already sufficiently discussed that testimony and Gibbins' emphatically contrary testimony.[20] (c) Plaintiff's requested charge No. 7 would have told the jury the following: The jury must find that defendant, as a matter of law, was obligated to furnish boxes fit for plaintiff's use, if the jury were to find that plaintiff accepted the boxes after plaintiff received the April 18 letter and the accompanying reports, if the jury further found that defendant knew the purpose for which the boxes were to be used, and that plaintiff was relying upon defendant to supply boxes suitable for that purpose. Had the judge so charged, he would have committed error; for this suggested charge would have omitted to tell the jury that they must ignore the April 18 papers, if they found as a fact that plaintiff's April 7 letter was an acceptance by conduct of defendant's March 18 counter-offer. (d) The first five sentences of requested charge No. 9 were covered by the judge's charge. The last sentence presented a hypothetical situation at variance with the evidence. (e) Plaintiff's requested charges 8 and 10 [21] were sufficiently covered by the judge's charge and by plaintiff's requested charges Nos. 1 and 2, which the judge allowed and said he was willing to state to the jury.

As nothing in the refused requests gave the judge a sufficiently clear indication of the error in his charge, cases like Sweeney v. United Feature Syndicate, 2 Cir., 129 F. 2d 904, 905 and Alcaro v. Jean Jordeau, 3 Cir., 138 F.2d 767, 771, are not in point.

4. *Alleged error in excluding certain documents.*

■ Plaintiff offered in evidence, but the judge refused to admit, some mimeographed

See, e. g., New York Central R. Co. v. Johnson, 279 U.S. 310, 318, 319, 49 S.Ct. 300, 73 L.Ed. 706; United States v. Haug, 2 Cir., 150 F.2d 911, 915.

[18] Although plaintiff in its brief insists that the judge erred in refusing this request relating to Allen's testimony, it also says that it "does not rely in any particular upon the testimony of Allen to establish the existence of a warranty."

[19] Plaintiff there says that the part of Allen's testimony was to the effect that he had then "orally rejected" the counter-offer.

[20] The verdict indicates that, on this issue, the jury disbelieved Allen. It may be that the jury's reaction to this disbelieved testimony, as to his willingness to cheat his government, had some effect on other aspects of the verdict.

[21] Plaintiff does not on this appeal urge as error the refusal to charge the last paragraph of request No. 10.

copies of "bulletins" found in defendant's files. These "bulletins"—bearing the typed signature of defendant's general manager, and, from their wording, seemingly designed for the information of defendant's employees—included statements about the elimination of "wick-action" by defendant's ply-metal containers. There was, however, no proof or offer of proof that these bulletins ever left defendant's files. For all that appears, they were drafts, never used—at best, mere soliloquies of one of defendant's officers. We see no error in their exclusion.

Affirmed.