No. 16,792.

WALLOWER v. ELDER, DOING BUSINESS AS COLORADO MACHINERY AND SUPPLY COMPANY.

(247 P. [2d] 682)

Decided July 14, 1952.   Rehearing denied August 25, 1952.

Messrs. Johnson & Robertson, for plaintiff in error.

Mr. Leo W. Kennedy, for defendant in error.

*En Banc.*

Mr. Justice Holland delivered the opinion of the court.

Defendant in error was plaintiff in the lower court, and we will herein refer to the parties by name as Elder and Wallower.

Elder, since 1903, had operated a machinery and supply company, selling new and used farm equipment, power units and electric equipment; was a trained mechanic; and at the time this controversy started, was the agent for Heil Manufacturing Company, which produced and sold Heil dryers for processing alfalfa hay. In the spring of 1949, Wallower consulted Elder concerning the purchase of a Heil dryer, a mobile machine for rapid drying of hay, to be available for processing concentrated farm feed. This unit required an additional power unit and grinder, various kinds of which Elder had on hand. Through Elder, Wallower purchased the dryer from the manufacturer and went to Milwaukee and there completed the negotiations and returned to Elder's place of business with the dryer. Before leaving to get the dryer unit, Wallower arranged with Elder for a used Chrysler motor and a used grinder to be placed upon a trailer

with other equipment, to be ready for field operation upon his return. The cost of the trailer was $8,500.00 on which Wallower made a down payment of $3,500.00 and arranged with the manufacturer for payment of the balance. The agreed purchase price with Elder for the mounted motor and grinder was $1,907.40, on which Wallower paid $500.00 May 28, 1949 when he signed the order, $435.00 on June 16, when he returned from Milwaukee with the dryer, and secured the balance by giving a chattel mortgage on the motor and grinder in the amount of $1,005.20, payable $67.02 monthly for fifteen months, beginning July 15, 1949.

The Chrysler motor and the grinder were used equipment and when put to the field test failed to operate properly. After continued efforts to repair and make the equipment operate satisfactorily, Wallower was never able to make it produce its fullest capacity and on account of shut down and other items, he claimed loss and damage and finally gave Elder notice of rescission of his contract, made demand for return of the purchase-price money, and finally wrote a letter of rescission in August of 1949. He retained the equipment by reason of a lien claimed thereon until the purchase price had been refunded.

In April of 1950, Elder filed his complaint in replevin in the district court of Jefferson county. Wallover answered and filed a cross complaint and asked for rescission for breach of an implied warranty on the ground that Elder had sold him the motor and grinder with the specific knowledge that they were to be used in connection with the Heil dryer and he asked for a return of his down payments, sales tax, a cancellation of his note, and special damages. Elder replied, denying the allegations of Wallower's cross complaint and supplemented his pleadings by allegations that when the property was replevined, it was found to have been damaged while in Wallower's possession after rescission, and that the equipment was sold at public auction for a net of $406.04,

which sum had been applied upon the balance of Wallower's purchase-price note, leaving a deficiency of $695.96 for which he prayed judgment. Wallower, by a bill of particulars, sought $1,907.40 paid on his note with interest and special damages of $582.48 paid out for materials and labor because of the breakdowns in the motor and $2,668.20 for loss of earnings from the Heil dryer due to the inability of the motor, which Elder had sold him, to meet the requirements for which it was needed, as he had explained to Elder.

The evidence was submitted to a jury, at the conclusion of which, Elder's counsel moved for a directed verdict in plaintiff's favor on Wallower's cross complaint and therein contended that the remedies for an implied warranty under section 15, chapter 143 (A) of the Uniform Sales Act (S.L. '41, c. 228) 1945 Cum. Supp. '35 C.S.A., had no application to used goods. The motion was denied with leave to plaintiff's counsel to renew it, and the case was submitted to a jury under proper instructions, to which no objections or exceptions are noted. Among the instructions there is shown a stipulation of counsel to the effect that if Elder was entitled to recover upon his note, the balance due was $603.00 principal and $75.00 attorney's fee. On the other hand, if Wallower was entitled to recover, he would be entitled to a judgment of $935.00, plus $37.50 sales tax, together with damages, if any. On June 16, the jury returned a verdict for defendant Wallower, for $972.50, the part of the purchase price paid by him, and $1,000.00 special damages, and it did not return a verdict of $678.00 for Elder, the plaintiff, which was submitted to it.

In due course, counsel for Elder filed a motion for new trial, supported by affidavit, contending that the evidence was insufficient to support the verdict and also accompanied the motion with a special motion for ruling on his previous motion for a directed verdict. On August 27, the trial court granted Elder's motion for a directed verdict; set aside the jury's verdict for Wallower; en-

tered judgment for Elder of $678.00; and overruled Elder's motion for a new trial. In so doing, it appears that the court's theory in setting aside the verdict and rendering a judgment for Elder was, first, that the Uniform Sales Act did not apply, because Wallower had the same right of examining the motor as Elder did; that Wallower did not rely on Elder's advice, but acted upon his own judgment and the advice of others; bought the motor "as is"; and finally, that the provisions of the Uniform Sales Act as to implied warranties is not applicable to used goods.

The writ of error herein is prosecuted on Wallower's contention that the trial court invaded the province of the jury which had the trial for facts upon conflicting evidence or evidence that was preponderately to Wallower's advantage; further, that section 15 of the Uniform Sales Act does not distinguish in any manner between new and used goods, but expressly states that its various provisions control in the sale of all chattels; and further, that the court's decision was legislative in nature.

Section 15 of the Uniform Sales Act, supra, in part, is as follows:

"Section 15. Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

Nothing could be clearer than that the terms of the Act are directed to the sale of *all* chattels. There is no exclusion of used goods in the definition of property to be

covered by the Act and when the trial court ruled that the Act did not apply as to used or second hand goods, it was equivalent to reading into the statute an exception which the legislature, in its sole province, did not see fit to do.

The next, and controlling, question in this controversy is: Was there an implied warranty on the part of Elder, the seller? The section of the sales act above quoted clearly provides for an implied warranty that the goods be reasonably fit for the uses, made known to the seller by the buyer, for which they were purchased, and in addition the average case hinges on the question of whether or not the buyer makes known to the seller the uses for which he desires the chattels, and whether or not he depends upon the seller's skill and judgment and representations, if any. If the buyer has equal or superior skill and experience to that of the seller, and has full opportunity to exercise it by examination and actual test in the uses intended, and fails to do so, then he is not warranted in relying solely upon a seller's statement that whatever is about to be furnished will accomplish the desired result. Where the transaction is one of oral consummation, any question or dispute arising therefrom as to the matter of whether an implied warranty exists or not, is a jury question. *Piccoli v. Paramount Lubricants Co.*, 80 Colo. 175, 250 Pac. 149.

We now examine the evidence as it relates to this question. It is to be noted that all conflicts were resolved in Wallower's favor by the jury. It was unmistakably shown that Wallower in the first instance made full explanation to Elder as to the purposes for which he was contemplating buying the entire needed equipment. Elder was the agent for the company which manufactured the dryer and Wallower told him that he wanted to dry chopped alfalfa hay, either on contracts with farmers or for himself to sell as concentrated feed. He purchased the dryer through Elder upon advertisements given him by Elder and made the first down payment to

him for the dryer. This payment was by check, which was misplaced, and Wallower subsequently made the down payment direct to the manufacturer at Milwaukee, Wisconsin. As to the other equipment, namely, the motor and grinder which Elder had on hand in the form of used equipment, there is a conflict as to whether Wallower selected the motor and grinder, or whether Elder made the selection and Wallower relied thereon. Of course, this conflict was clearly presented to the jury which was fairly instructed thereon and it seemed to believe Wallower's version of the transaction. Wallower testified that Elder had advised him that in order to conduct the business Wallower contemplated, he would require a Heil dryer and a power motor and grinder, and further recommended a grinder that would require 100 horsepower. Wallower had previously priced a new 100-horsepower Chrysler unit at a Chrysler dealer's and he so advised Elder; thereupon Elder told him he had a used unit that could do the business and suggested that Wallower buy it and save money, because the motor was in good running order; that it had been turned in from use on a power shovel in trade for a diesel engine; and that he did not think the motor had had too much use. The evidence discloses that it had been lying idle in Elder's place for approximately two years without any inspection or repair of any kind after it had been used for about a year on a power shovel, lifting material weighing from one to ten tons. The evidence shows that the motor was started and run idle for a short time in Wallower's presence, but it is also disclosed that at no time did Wallower have an opportunity to inspect the motor when operating under a load which would develop defects that would not show up while idling. Wallower was a young man with no experience whatsoever with the workings and operation of a dryer, and the motor and grinder that was needed to accompany it. Elder had operated a machinery and supply company, selling new and used equipment and power units for approximately

forty-six years, was a trained mechanic, and he testified that Wallower chose the Chrysler motor because it was cheap. However, Wallower's testimony was that it was selected by Elder because it would do the work as well as a new one, thereby effecting a saving of several hundred dollars. It was shown that it was not necessary for Wallower to economize, because he had ample cash and credit to finance the entire transaction. Wallower testified that he saw the motor idling for five or ten minutes when he returned from Milwaukee with the dryer on June 6, and that it was not connected with the grinder at that time; that it was never operated until the entire outfit was taken to a farm when a load was put on it in due course of the purpose for which it was purchased. On the very day the motor was put on test in connection with the dryer and grinder working upon a load of chopped hay, it immediately overheated. Elder was called and on arrival, put some cleansing material in the radiator; however, the motor still overheated. Wallower, after he and his employees had torn the water pump down, insisted that a new pump be put in as recommended by the Chrysler agency, but Elder refused to do so. Elder paid for the parts, but Wallower had to stand the cost of dismounting and replacing and the loss of time. At this time and subsequently, during most of the breakdown of the motor, the dryer was operating at about fifty per cent of its advertised capacity and consequently the motor was not put to the full test for which it was sold; however, on this one-half capacity, the motor continued to overheat and its power was reduced, which caused the grinder to plug up and more time was lost in cleaning out the grinder. There were continuous breakdowns from overheating until Wallower had the motor completely overhauled, and the water pump had to be finally rebuilt the second time, the expense of which, Elder refused to pay. On July 13, the motor's oil line broke, allowing all the oil to escape and as a result the motor froze. Elder suggested that he would fix it up if Wal-

lower would pay for the parts; and in order to get his operations going again, having seven men working for him on day and night shifts at one dollar per hour for each, he complied with Elder's suggestion. This breakdown put the entire operations out of business from July 14 to August 1 and prevented Wallower from completing his ranch contract. After the last repairing, the motor operated satisfactorily, but the grinder plugged up, and on August 8, Wallower gave Elder notice of rescission. The evidence shows that during these operations the machinery had proper care according to the standard practice in the operation and maintenance of such equipment. It is clearly shown by the evidence that Wallower made every effort to have the equipment perform the work for which it was purchased. Wallower introduced testimony showing his damage, consisting of the cost of parts, and labor in repairing the motor; loss of wages paid out during delay in operations caused by breakdowns and failure of equipment to operate properly; and loss of revenue for inability to fulfill contracts which had been taken in contemplation of the equipment working to full capacity. There is no dispute as to the items of damage.

That the motor recommended by Elder as being capable of doing the job required by Wallower had had hard service, was well known to Elder, although during the approximate two-year period that it was standing on his premises he never inspected or repaired the machine in any manner. It is reasonable to presume that when Elder, being advised of the purpose for which the motor was required, made the representation or statement that this particular motor would do the job, that it would be relied upon by the purchaser, and that the motor would be reasonably fit for the purposes made known to the seller. Wallower would have been justified in relying upon the seller's representation and judgment in the matter, but if this question was in the least doubtful, it was for the jury to settle, and it determined that fact in

Wallower's favor. We believe that the testimony supports the finding of the jury that there could be an implied warranty under the circumstances. It is rather apparent that the trial court in finally determining the motion for directed verdict, after the verdict, relied upon Colorado cases which were decided before the Uniform Sales Act was adopted. It being clear that the Uniform Sales Act does cover used or second-hand chattels, and that here the buyer, not entirely by implication, but expressly, made known to the seller the particular purposes for which he desired to use the articles in question, and that he relied on the seller's judgment, there is an implied warranty that the equipment sold to him was reasonably fit for the desired purposes, and this conclusion is fortified by the jury's finding to that effect. If we followed the contention of defendant in error by holding that section 15 of the Uniform Sales Act, supra, was not applicable to used goods under proper circumstances, we would be indulging in judicial legislation, and if we further held that the circumstances of the case and much of the undisputed testimony were not sufficient to sustain the claim of an implied warranty, we then would be trespassing in the jury's exclusive field. There is ample evidence to support the jury's verdict in Wallower's favor and when it failed to return a verdict submitted to it in Elder's favor, it was error for the trial court to set aside the jury's verdict and enter a factual verdict in favor of Elder. If the trial court's judgment was entered upon a reservation to have the question of law determined which might be done in spite of a verdict, then the judgment is wrong because based upon a wrong interpretation of the law as we have shown herein. We do not believe that rule 50, R.C.P. Colo., allows for a belated disturbance of a jury's finding on the facts when a reservation has been made to determine law questions only.

For the reasons stated herein, the judgement is reversed and the cause remanded with directions to reinstate the jury's verdict.