**BEECH AIRCRAFT CORPORATION**

v.

**FLEXIBLE TUBING CORPORATION**
**and Vernon Hines, d/b/a Thermo**
**Tech Products Company.**

**Civ. No. 10085.**

United States District Court
D. Connecticut.

May 17, 1967.

William M. Mack, Thompson, Weir & Barclay, New Haven, Conn., for plaintiff.

John D. Fassett, Curtis H. Barnette, Wiggin & Dana, New Haven, Conn., Walter Shepard, New York City, for Flexible Tubing Corp. and Vernon Hines.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This is a suit for breach of warranty. The plaintiff buyer seeks rescission of a sale of specialized hoses on the ground of the seller's breach. The defendant counterclaims for a liquidated sum due

and owing. Jurisdiction of this court is based on diversity of citizenship. 28 U.S.C. § 1332(a). The amount in controversy is in excess of $10,000.

## The Facts

The plaintiff, Beech Aircraft Corporation (hereinafter "Beech"), is a Delaware corporation with its principal place of business in the State of Kansas and a branch office in Boulder, Colorado. Its business is the manufacture and development of aircraft and supporting systems. The defendant, Flexible Tubing Corporation (hereinafter "Flexible"), is a Connecticut corporation engaged in the manufacture of specialized hosing. Vernon Hines, a citizen of Colorado, is a defendant only as an agent of Flexible by stipulation of the parties.

This action arises out of research and development projects of the American space program. The plaintiff Beech was awarded a government contract for the design of fuel and oxidizer trailers to be used in conjunction with the Titan II rocket program. The prime contractor for the rocket was Martin-Marietta Corporation (hereinafter "Martin").

Titan II was a liquid fueled rocket. Its propellants consisted of Aerozine 50, a 50–50 mixture by weight of unsymmetrical dimethyl hydrazine (hereinafter "UDMH") and anhydrous hydrazine as fuel, and nitrogen tetroxide (hereinafter "$N_2O_4$") as oxidizer. Both fuel and oxidizer are extremely toxic and corrosive. They attack and destroy nearly all ordinary materials with which they come in contact. Consequently, the vehicles and systems used in storing, transporting and pumping these propellants must be manufactured from special materials which are "compatible" with these corrosive fluids. Compatibility implies a workable life span for the materials used in conjunction with these fluids, considering cost, use, and the nature of the chemicals.

In November 1960 Beech learned that the Government (Air Force) was about to invite bids on developing and constructing the trailers. After some preliminary investigations and analysis, it submitted a bid and was formally awarded the contract on December 9, 1960. The contract called for the design and manufacture of six 3,000 gallon oxidizer semi-trailers and six 5,000 gallon fuel semi-trailers. As is usual with government contracts, elaborate test procedures were outlined. Beech was to first construct an operating prototype of each type of trailer and subject this unit to extensive tests. Upon successful testing, five additional units were to be furnished.

In order to transport the propellant from the trailer to the rocket, a hose would be utilized. Because of the corrosive and volatile nature of the fluids, the transfer was to be accomplished in a closed system. Thus, two hoses would be utilized; one to deliver the propellant to the rocket and another to return the fumes from the rocket to the trailer. The hoses were to be twenty feet in length and of differing diameters. Each fuel trailer required a three inch transfer hose and a one and one-half inch fume return hose. The oxidizer trailers, because of the greater viscosity of $N_2O_4$, required a four inch transfer hose and a two inch fume return hose. The transfer hoses were to be capable of transporting fluid at a rate of 250 gallons per minute and were to be able to withstand certain clearly designated pressures. All hoses were to be furnished with the trailers and would be used in the field with them.

It was against this backdrop that Beech sought to procure suitable hoses. The company was strongly considering the use of convoluted stainless steel hoses. These were of suitable flexibility, and stainless steel was acknowledged to be compatible with both propellants. However, the convolutions by their nature trapped small amounts of the chemicals and resulted in considerable difficulty in cleaning or purging the hose before storage. A smooth bore hose was therefore highly desirable. Such a hose would not only be easy to clean, but would permit lower pumping pressures.

So it came to pass that Beech was in the market for some trailer hose in late December 1960. Wayne Killian, a Beech procurement engineer at the Boulder plant, telephoned Vernon Hines, a hardware supplier in Denver doing business as Thermo Tech Products Company. Hines had previously supplied hardware parts to Beech, and Killian asked him about supplying hoses for the trailers. Hines agreed to come to the Beech plant at Boulder and discuss the company's needs.

The events following were and are crucial to the resolution of this case in that they determine the nature and scope of warranties made. Killian informed Hines of the purpose for and materials with which the hoses would be used. (Killian Dep. p. 60.) Hines was aware that Martin was presently using smooth bore teflon hoses for the same propellants and passed this information on to Killian at this first meeting. Hines and Killian then agreed upon a time for a meeting with Krabbe, a Flexible sales representative, during the first week of January 1961. At this meeting Killian again informed Hines, and in particular Krabbe, of the specific performance standards that the hose would be expected to meet. They in turn responded that they "could meet the intent of the specifications at that time, and that the hoses would be suitable for the particular service involved." (Killian Dep. p. 76.) Krabbe had reports with him concerning tests of the materials comprising the hose but no final reports of the performance of the hose as an integrated unit. Furthermore, Krabbe produced a sample of the hose which was inspected by Killian or his assistant. This sample was intended for Martin and was not left with Beech or its agents for any period of time. Subsequently, another small sample of hose was left with Killian by Hines. (Tr. pp. 177–78.)

Also at this meeting, Krabbe brought out the point that Flexible was manufacturing this hose for Martin in connection with their use of UDMH and N₂O₄ as propellants for Titan II. Beech could reasonably infer from this statement that the hoses were satisfactory to Martin and would accordingly be suitable for Beech's purposes. Plaintiff relied upon this statement as a representation that the hoses would be suitable for intended purposes.

On January 12, 1961, during this time, Vernon Hines, on behalf of Thermo Tech Products Company, submitted quotations for supplying teflon hoses. (Ex. 5.) A drawing was attached, No. 112–B1, showing a hose entitled "Pressure Hose—For Use with Hydrazine and Nitrogen Tetraoxide [sic]." (Ex. 6.) A note on this drawing stated: "The Rubber Compound used will be *compatible* as well as the Teflon." (Emphasis added.) Both the drawing and quotations referred to Thermo Tech part numbers. Accordingly, on January 12, 1961, Killian wrote out an "Engineering Department Purchase Requisition" for one hose of each size. (Ex. 7 & 8.) The Beech purchasing executives, however, deemed this price too high and on January 24, 1961, Hines sent Beech a revised quotation by telegram. (Ex. 9.) The revised prices were based on Hines' acting as a sales representative for the manufacturer Flexible, in lieu of serving as an independent distributor. The defendant has conceded that Hines was acting as its agent in the sale of the hose.

On January 26, 1961, Beech, by A. D. Hickerson, its chief purchasing agent in Wichita, wired Thermo Tech Products (Attn. Vernon Hines) ordering six of each hose size. This telegram (Ex. 10) used Thermo Tech part numbers and indicated that "[a]ll items to be per drawing 112–B1" which Hines had previously furnished Beech. Detailed shipping instructions were given. The following day, January 27, 1961, a formal purchasing order (No. 68831–5) (Ex. 11) was sent to Thermo Tech Products Company confirming the telegram. Again Thermo Tech part numbers were used and reference was made to Hines' drawing No. 112–B1. This order was to be effective only on signature of the

seller and return of the document to Beech. The order form contained at the bottom of the form surrounded by a heavy black line the following words:

"AGREEMENT: No conditions, terms, or provisions inserted by the Seller in acknowledging and accepting this order shall be effective unless the same are accepted in writing by the Purchaser."

On the back of the purchase order agreement is a paragraph entitled Warranty:

"Seller warrants that all items delivered under this Purchase Order will be free from defects in material and workmanship, that all items will conform to applicable specifications, drawings and samples, and to the extent such items are not manufactured pursuant to detailed designs furnished by Purchaser, that all items will be free from defects in design and suitable for the intended purposes."

On receipt by Thermo Tech, Hines forwarded the order to Flexible at Guilford, Connecticut.[1] There is no evidence that this purchase order agreement was ever signed.

Flexible thereupon sent Beech a Sales Order Acknowledgment form. (Ex. O.) Beech denies receipt of any such form. This form is customarily used by Flexible in its course of business. On the reverse side of the customer's copy are found the following Terms and Conditions:

"The terms of this acknowledgment shall prevail and supersede all previous correspondence and dealings between the parties. * * *

"Flexible Tubing Corporation guarantees its merchandise to be substantially as represented and to be free from defects in material and workmanship when it leaves the factory. Flexible Tubing Corporation assumes no liability for deterioration from abuse or use in combination with other materials. Liability for claims arising out of tort, contract or for any other reason is solely to repair or, at Flexible Tubing Corporation's option, to replace this merchandise at the factory; provided, however, that all claims must be filed in writing with Flexible Tubing Corporation within 45 days after shipment from the factory."

Beech never responded to this Acknowledgment, even if it received it. Despite the absence of any response from Beech, Flexible undertook to manufacture and deliver the twenty-four hoses. Upon delivery, Beech accepted the hoses and used them until it found them unacceptable.

On February 10, 1961, a procurement requisition order was filed within the Beech organization for one hose of each size as a spare part. (Ex. 13–16.) These spares were formally ordered from Flexible in April under the same procedure used for the twenty-four hoses. (Ex. 33.) Flexible again sent Beech the same type of Sales Order Acknowledgment in this connection as it did on the original order.

During the early months of 1961, a Mr. Jennings, of Martin, conducted tests on the suitability of Flexible's smooth bore teflon hose for carrying UDMH and $N_2O_4$. These tests disclosed that the hose was subject to bulging and discoloration. Furthermore, on at least one test stand Martin had rejected Flexible hose and was using stainless steel. Flexible was aware of these results at least by March 1, 1961, through Richitell's report. (Ex. 25.) The effect of these facts will be considered later.

On March 27, 1961, the first shipment of hoses arrived from Flexible. (Ex. 27.) This shipment consisted of two

[1]. It should be noted that Beech considered itself to be dealing through Hines, although it knew Flexible to be the manufacturer. Beech received quotations from Hines utilizing Thermo Tech part numbers and accompanied by Thermo Tech drawings. In turn, it sent its order for the hoses to Hines using his number system. Hines forwarded the order to Flexible and Flexible shipped under its own distinct number system.

hoses in each of the one and one-half, two and three inch sizes. The hoses were inspected and rejected because the flanges were not attached to both ends of the hose nor did the flanges have the proper 32 micron finish. (Ex. 28–30.) These objections were corrected locally in Denver by defendant or its agents and Beech accepted the hoses.

On April 6, 1961, a shipment arrived from Flexible of three hoses of one and one-half inch size, four hoses of two inch size, and four hoses of three inch size. (Ex. 31.) April 12, 1961, saw a shipment of two hoses—one of the one and one-half inch size, and one of the four inch size. (Ex. 32.) On April 18, 1961, the bulk of the four inch hoses arrived—four in number. (Ex. 34.) The last shipment, one hose of four inch diameter, arrived at Boulder on May 2, 1961. (Ex. 35.)

Again, many of the hoses were improperly assembled in that the flanges were not attached and/or the flanges did not have the required 32 micron finish. These hoses were repossessed by Flexible or its agents and corrections were made, either at Denver or at the Flexible plant after return to Connecticut.

Beech was by this time already well along in its production schedule on the trailer and preparing to begin testing the prototypes. In April and May of 1961 Beech used several hoses in conjunction with the fuel trailer to transfer diluted 10% solution of the Aerozine 50 fuel with water.

Full scale testing was to begin in late May. The Government had furnished detailed testing specifications for the trailers. Both fuel and oxidizer trailers were to be tested for discharge flow rates at room temperature and at high and low temperatures. In order to facilitate the extreme temperature tests, Beech constructed a special environmental chamber to house the trailers. The chamber was equipped with refrigeration and heating equipment capable of creating a range of temperatures from –80° F to 160°F. The trailers would be "soaked" at these temperatures for a forty-eight hour period. Thereupon, actual transfers would be made at –65°F and 130°F. (See ¶ 4.6.7.1 and ¶ 4.6.7.2 (p. 34) of R & D Exhibit WWDNSF–60–411 and R & D Exhibit WWDNSF–60–412 (Ex. 1)). The trailer and discharge hose were to be capable of creating a flow rate of 250 gallons per minute at each temperature.

Ambient or room temperature tests were run successfully on May 26, 1961. The physical set up for the test required two three inch fuel discharge hoses connected together and one one and one-half inch fume return hose. On the completion of the ambient tests, low temperature testing began on May 26, 1961. Difficulties were experienced with refrigeration equipment and in reaching the desired flow rate, but the cold test was successfully completed on May 30th. At this time, it was observed that the hoses were wet and discolored-looking in spots with small bulges in their surface. (Tr. p. 288.) Upon examination of the hoses, one section of teflon liner was observed to have become detached, causing a partial blockage of the discharge duct. This hose was replaced by another three inch section and submitted to the internal rejection process of Beech on June 8, 1961, by a Material Review Record. (Ex. 40.)

High temperature testing began on June 6, 1961. After some initial difficulties in obtaining the desired flow rate, a successful test was completed on June 10th. However, on the completion of these tests, the hoses were observed to be leaking and discolored. The diameter of the discharge hoses was distorted with numerous bulges. Since $N_2O_4$ is a more corrosive and damaging fluid than UDMH, similar or more serious defects could be expected if the hoses were used with the oxidizer. A consideration of the defects in the state of the hoses led Beech to a decision to reject the hoses for use with the trailers. This decision was made on or before June 19, 1961.

On June 8, 1961, a telephone conversation occurred between Mr. A Clark, of plaintiff's procurement department, and Mr. McPherson, of Flexible. Clark called

McPherson to expedite the shipment of certain flanges which had been returned to Flexible for refinishing. During the course of the conversation, McPherson asked Clark why he was so anxious to have the hose flanges since McPherson knew the hoses were not suitable for use with UDMH or $N_2O_4$. To this, Clark responded that he knew nothing of the matter and had merely called to expedite the shipment. After the call, Clark informed his superior Killian of the matter. Within twelve days of the call, the hoses had been rejected *en masse* on the basis of test failure.

On June 19, 1961, a meeting was held at the Beech offices in Boulder at which Mr. Krabbe, of Flexible, and Vernon Hines were present. Also present were several engineering and procurement officials of Beech. The minutes of this meeting (Ex. 43) reveal that Flexible was informed through Messrs. Krabbe and Hines that Beech considered the hoses unsuitable for its purposes. However, sufficient hose would be used in order to qualify the oxidizer trailer in its forthcoming government tests. Although Beech was aware of the fact that the use of the hose for the transfer of oxidizer would very likely destroy it, it decided to use the hoses because a substitute was unavailable within the time requirements of the government contract. Mr. Hines could have delivered suitable stainless steel hoses at least by July 9, 1961, (Ex. 75), if not sooner. (Tr. pp. 530-31.)

On June 19 or 20, 1961, the entire lot of the original twenty-four hoses was rejected through the internal Material Review Record process. (Ex. 44-47.) The purchase order for one spare of each hose, which had been sent April 12, 1961, (Ex. 33) was cancelled by telegram to Hines on June 21, 1961. (Ex. 50.) A formal change order cancelling the spares was sent to Thermo Tech on June 27, 1961. (Ex. 53.)

On June 22 and 23, 1961, Beech used two four inch discharge hoses and a two inch fume return hose in a test of the oxidizer trailer at normal temperature. This test came to an abrupt halt when the discharge hose severed and oxidizer poured out upon the ground and vaporized into the atmosphere in an orange cloud.

Flexible had redelivered two of the refinished four inch flanges to Beech at Boulder on June 20, 1961. The remaining refinished four inch flanges arrived there on July 11, 1961, together with two recently assembled hoses—one four inch and one one and one-half inch size hose. (Ex. 55.) These hoses had at least implicitly been rejected by the internal Material Review Records of June 19 and 20, 1961, and at the meeting of June 19th. (Ex. 43–47.) On July 18th, Beech attempted to return the twenty-four original hoses to Hines (Ex. 54) who refused to accept delivery. Also on July 18th, a shipment of the four spare Flexible hoses arrived at the Beech offices in Wichita in spite of the earlier cancellation. These hoses were likewise shipped to Hines, who again refused to accept them. After further discussion, Flexible authorized the return of the twenty-four hoses by motor freight per letter of November 16, 1961. (Ex. 68.) They were so shipped on November 27, 1961. (Ex. 73.)

During the Spring of 1961, Beech also received a communication from Martin asking it to test certain smooth bore teflon hose for it. (Ex. H & I.) This hose was identical with the Flexible hose Beech was using on its trailer contract. Beech agreed, ran the tests, and submitted a report to Martin on June 19, 1961. (Ex. K.) These tests run by Beech for Martin on the Flexible hose were independent of, but contemporaneous with the trailer tests of the same Flexible hose in June of 1961.

Such is the factual background of this lawsuit.

Plaintiff seeks rescission and a refund in the amount of the purchase price, $23,616.45, plus interest at 6% from September 8, 1961, the date of demand by plaintiff. Defendant counterclaims for $4,063.00 still due and owing as payment for the spare hoses and for $2,078.-

40 on miscellaneous purchases. This $2,078.40 is admitted as a debt by plaintiff. Defendant also seeks interest at 6% from the date of each invoice.

### The Nature of the Transaction

The buyer, Beech, contends that the Flexible hoses were unsatisfactory for use with UDMH and $N_2O_4$. Consequently, it argues that there occurred a breach of both an express warranty and an implied warranty of fitness for a particular purpose. In support of this position, buyer recites the facts and cites pertinent portions of the Uniform Sales Act, U.S.A. § 12, § 15(1) and § 69.[2] Both parties agree that since Connecticut and Colorado's laws are the same no choice of law problem is involved.[3] Insofar as pertinent decisions have been found their courts are not in disagreement.

2. The relevant portions of the Sales Act are:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty." U.S.A. § 12, Conn.Gen. Stats. § 42–11, Colo.Rev.Stats. 121–1–12.

"When the buyer expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose. * * *" U.S.A. § 15(1), Conn.Gen.Stats. § 42–14, Colo.Rev.Stats. § 121–1–15(1).

"When there is a breach of warranty by the seller, the buyer may, at his election * * * Rescind the contract to sell or the sale and refuse to receive the goods, or, if the goods have already been received, return or offer to return them to the seller and recover the price or any part thereof which has been paid. Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he

The formal Beech purchasing order dated January 27, 1961, contained certain warranty specifications and was to be accepted by signature of the seller and return of the document to Beech. This order was never signed. Instead, the addressee, Thermo Tech, forwarded the order to the manufacturer, Flexible. Flexible, in turn, drew up a Sales Order Acknowledgment, a copy of which it mailed directly to Beech. This confirmation of the order contained at the bottom in fairly bold print a statement:

"THANK YOU FOR YOUR ORDER The Acceptance of Which is Subject to the Terms and Conditions on the Reverse Side Hereof.

FLEXIBLE TUBING CORPORATION."

On the reverse side were contained the warranty provisions described above.

fails to return to or offer to return the goods to the seller in substantially as good condition as they were at the time the property was transferred to the buyer. If deterioration or injury of the goods is due to the breach of warranty, such deterioration or injury shall not prevent the buyer from returning or offering to return the goods to the seller and rescinding the sale." U.S.A. § 69, Conn.Gen.Stats. § 42–69, Colo.Rev. Stats. § 121–1–69.

3. A federal court sitting in Connecticut in a diversity case will look to the conflicts law of that state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). A Connecticut court in this case would most likely look to the law of Colorado since the sale was negotiated there, the goods were accepted there and would be used there. Beggs & Co. v. Bartels, 73 Conn. 132, 46 A. 874 (1900); Illustrated Postal Card & Novelty Co. v. Holt, 85 Conn. 140, 81 A. 1061 (1912). Even if Connecticut as the forum state chose its own law to ascertain where the sale occurred, the result would be unchanged. No statute unique to either state is involved in considering the nature of the sale. The law of both states, as representative of common law, may be applied.

Both parties concede that their obligations as to the sale of these goods are controlled by the relevant provisions of the Uniform Sales Act. This act was in effect in both Connecticut and Colorado at the time these events took place.

Beech made no reply to this document. In fact, it denies receipt of it. Thereafter, the hoses were manufactured and delivered to Beech, who ultimately accepted them and paid the purchase price.

### Discussion

No doubt the parties by commercial understanding thought that the hoses in question had been shipped in accordance with a contract embodied in a writing. They are in dispute as to which writing —the purchase order, or the acknowledgment—embodies the binding terms.

### I.

██. The January 27, 1961, purchase order from Beech constituted an offer to buy on certain terms and conditions, acceptance to be indicated by seller's signature on the order. Flexible's response was not a signature on this purchase order but a document containing contrary terms on warranty. This Sales Order Acknowledgment could hardly be called an "unequivocal acceptance" of buyer's offer. United States v. Braunstein, 75 F.Supp. 137 (S.D.N.Y.1947), appeal dismissed, 168 F.2d 749 (2d Cir. 1948). In the words of Judge Medina:

"To create a contract, an acceptance must be 'unequivocal' * * * 'positive and unambiguous,' * * * and 'must comply exactly with the requirements of the offer' * * *. A reply to an offer that fails to comply with these requirements is a rejection. * * *" (75 F.Supp. at 139).

Since the Sales Order Acknowledgment cannot be treated as both an acceptance of the buyer's offer and the introduction of its own different terms of warranty, it constitutes a rejection and a counteroffer.[4] Riverside Coal Co. v. Elman Coal Co., 114 Conn. 492, 159 A. 280 (1932); Poel v. Brunswick-Balke-Collender Co., 216 N.Y. 310, 110 N.E. 619

4. The Uniform Commercial Code today expressly provides that a confirmation which contains additional terms may constitute an acceptance unless the new terms materially alter the offer. Uniform Commercial Code § 2–207. An additional clause negating standard warranties is

(1915); Restatement of Contracts, § 38 (1932). Cf. Gateway Co. v. Charlotte Theatres, Inc., 297 F.2d 483 (1st Cir. 1961).

### II.

██ The next question is whether Beech accepted this counteroffer with its terms. Although Beech contends that it never received this seller's "Acknowledgment," Flexible has proved that the document was sent in the regular course of business. The "Acknowledgment" was part of a multilith carbon set and seller has produced its copies of the form for the instant transaction. (Ex. M & N.) Buyer's response is an unsupported denial of receipt. On these facts, there is an unrebutted presumption of receipt. Roto-Lith, Ltd. v. F. P. Bartlett & Co., 297 F.2d 497, 498 (1st Cir. 1962). See I Wigmore on Evidence § 95 (3d ed. 1940).

 Silence alone does not constitute an "expression of acceptance" of an offer or a counteroffer under normal circumstances. Columbia Malting Co. v. Clausen-Flanagan Corp., 3 F.2d 547, 551 (2d Cir. 1924). It did not in this case.

### III.

██ However, positive acts may constitute acceptances in the absence of expressed assent. In particular, if the offeree uses seller's goods for his own purposes, such action is deemed to constitute an acceptance of the terms of the counteroffer or offer. Professor Corbin uses apt language:

"[W]here goods are shipped on different terms from those proposed by the buyer, the acceptance and use of the goods without notice of dissent is an acceptance of the terms of the seller's counteroffer." (Corbin, Contracts, § 75, p. 121 (One Vol. ed. 1952)).

considered to "materially alter" the offer. Uniform Commercial Code § 2–207, Comment 4. A confirmation similar to that in the instant case would accordingly constitute a counteroffer even under the Code.

See also 1 Williston, Contracts, § 91D, p. 289 et seq. (Rev. ed. 1936); and Restatement of Contracts, § 72 (1932). The case law is in agreement that an offer or counteroffer is accepted in its terms by taking a benefit from or exercising dominion over the goods. Joseph v. Atlantic Basin Iron Works, Sup., 132 N.Y.S.2d 671 (Sup.Ct.1954), aff'd, 285 App. Div. 1147, 143 N.Y.S.2d 601 (App.Div. 1955); Doerr v. Woolsey, 5 N.Y.S. 447 (Common Pleas), reargument denied, 7 N.Y.S. 662 (1889); Maltby, Inc. v. Associated Realty Co., 114 Conn. 283, 288, 158 A. 548 (1932); Russell v. Texas Co., 238 F.2d 636, 642 (9th Cir. 1956), cert. denied, 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957). See particularly, Roto-Lith, Ltd. v. F. P. Bartlett & Co., supra, 297 F.2d 497.[5] Cf. Alaska Pacific Salmon Co. v. Reynolds Metals Co., 163 F.2d 643, 655 (2d Cir. 1947).

Beech accepted and paid for the original twenty-four hoses before June 19, 1961. It was on this date that Beech officials informed Flexible through its agents Hines and Krabbe that the hoses would be rejected. But the earlier acceptance of these hoses by the buyer consummated a sale with normal warranties except as limited by the terms of the seller. The fact that certain of these original twenty-four hoses were returned to be properly finished or assembled did not vitiate Beech's original acceptance of them.[6] Moreover, Beech paid for the original twenty-four hoses as a unit. Consequently, all twenty-four hoses had been accepted by Beech by June 19th, even though some of the returned hoses would arrive after this date. On all these hoses, the buyer is bound by the terms of the contract and may maintain an action for breach of warranty albeit only within the limitations of seller's terms.

The buyer's position with respect to the four spare hoses is different. These hoses were ordered by a separate purchase document dated April 12, 1961. (Ex. 33.) This order was rejected by Flexible's Sales Order Acknowledgment of April 21, 1961, (Ex. N) which again constituted a counteroffer to sell four hoses on different terms. These hoses were never received by Beech until after the June 19th date. On receipt, the buyer immediately attempted to return them to the seller. Consequently, the seller's separate counteroffer on the spare hoses was never accepted by the buyer. Restatement of Contracts, § 72(2). Beech never received a benefit from nor exercised dominion over these hoses. Consequently, there being no acceptance of Flexible's counteroffer, there was no contract and Beech is not liable for the purchase price on these hoses.

### The Warranty Obligations
### Express Warranty

With respect to the twenty-four hoses, the defendant does not deny that it is obligated to the extent of the terms of the following provision:

"The terms of this acknowledgment shall prevail and supersede all previous

5. In the *Roto-Lith* case, the buyer sued seller for breach of a warranty of fitness concerning some special adhesive emulsion used to seal cellophane bags for packaging frozen vegetables. Buyer ordered a quantity of the emulsion specifically disclosing its end use. Seller responded with an "acknowledgment" and "invoice" which specifically disclaimed all warranties. These documents would have been mailed in seller's ordinary course of business. Buyer denied receipt of them. Eventually the goods were shipped and buyer accepted and paid for them. The court held that the "acknowledgment" was effective only as a counteroffer and was presumed by law to have been received by buyer. The acceptance and use of the goods by buyer constituted acceptance on the terms of the seller.

6. Even though the buyer returned the goods for a proper finish, by this conduct Beech did not intimate to the seller that it was rejecting them. Cf. U.S.A. § 48, Conn. Gen.Stats. § 42–48.

The return of the hoses to the seller to refinish and reassemble them constituted an exercise of dominion by the buyer within the meaning of Restatement of Contracts, § 72(2).

correspondence and dealings between the parties. * * *

"Flexible Tubing Corporation *guarantees its merchandise to be substantially as represented* and to be free from defects in material and workmanship when it leaves the factory. Flexible Tubing Corporation *assumes no liability for deterioration from abuse or use in combination with other materials.* Liability for claims arising out of tort, contract or for any other reason is solely to repair or, at Flexible Tubing Corporation's option, to replace this merchandise at the factory; provided, however, that all claims must be filed in writing with Flexible Tubing Corporation within 45 days after shipment from the factory." (Emphasis added.)

Putting aside for the moment the distinction between warranties implied from the act of selling and warranties arising from expressions of the seller, the voluntary guarantee, contrary to the seller's contention, falls far short of stripping the buyer of protection. Flexible guaranteed its hoses to be as represented, provided they were not abused or used in combination with other materials. Since the conditions of that proviso were not present, it did not come into play. The remaining question is what representations Flexible made.

The defendant's argument is that it "represented to Beech only that Martin was purchasing and testing the same hose. * * * Far from making any express or other warranties, except that its goods would conform to the sample, be substantially as represented and free from defects and workmanship when they left the factory, Flexible expressly disclaimed such warranties [fitness for a particular purpose or of merchantability]. * * *" (Defs.Br. p. 17.) While there is some evidence introduced by Flexible to support its view of what its representations were, other and convincing evidence established that its representations went much further.

At the first meeting between Killian, Beech's procurement engineer, Krabbe,

a Flexible sales representative, and Hines, who was acting as an agent for Flexible, the central point of discussion was not simply the purchase of hoses of certain dimensions, but of smooth bore hoses that would be suitable for transferring UDMH and $N_2O_4$ and the fumes these fluids would release. Curiously enough, Mr. Krabbe remarked that Flexible's preliminary tests on the materials being used to make up the hoses had been satisfactory and that testing by Martin of completed hoses would confirm their suitability for the required purposes.

▮ Furthermore, before Beech ordered the hoses, Hines, Flexible's agent, submitted quotations to Beech for supplying teflon hoses. A drawing was attached to these quotations, showing a hose entitled "Pressure Hose—For Use with Hydrazine and Nitrogen Tetraoxide [sic]." A note on that drawing read: "The Rubber Compound used will be compatible as well as the Teflon." Unless Flexible's guarantee of its hoses "to be substantially as *represented*" (emphasis added) is to be treated as wholly illusory, content can be given to "represented" only by referring to the representations made by its agents, for there are no representations within the Acknowledgment itself. The Acknowledgment does not say "no representation, except when made in writing by a duly authorized officer of [Flexible], shall be deemed to be part of this Agreement," as, e. g., in Sperry Rand Corp. v. Industrial Supply Corp., 337 F.2d 363, 370 (5th Cir. 1964). I conclude that Flexible expressly warranted that the hoses would be reasonably fit for use with UDMH and $N_2O_4$.

It has been argued that the language: "the terms of this acknowledgment shall prevail and supersede all previous correspondence and dealings between the parties" is an integration clause which closes the door to any consideration of conduct and statements made by the defendant outside the written Acknowledgment. Such a view would render the guarantee inherently meaningless for lack of any cognizable representations,

for there are none in the Acknowledgment itself.

*Disclaimer*

The Acknowledgment does not contain a provision that there are no implied warranties. Notwithstanding, Flexible declares that "far from making any express or other warranties, except that its goods would conform to the sample, be substantially as represented and free from defects and workmanship when they left the factory, Flexible expressly disclaimed such warranties. * * * " (Defs.Br. p. 17).

▇▇▇ It is clear that both express and implied warranties may be effectively disclaimed by sufficiently specific language. U.S.A. § 71; Conn.Gen.Stats. § 42–72. Bridgeport L.A.W. Corp. v. Levy, 110 Conn. 255, 147 A. 841 (1929); Modern Home Utilities, Inc. v. Garrity, 121 Conn. 651, 654, 186 A. 639 (1936). But no particular language negating warranties has been pointed out by Flexible, nor do I find any. Any language susceptible of interpretation as a disclaimer will be strictly construed against the seller to the effect that it will not negate implied warranties unless specifically mentioned. See 2 Frumer & Friedman, Products Liability, § 19.07 [1], p. 550, n. 12 (1966), and cases cited therein.

▇▇▇ Further, there is an express obligation to repair or replace the hoses at the factory. The presence of such a provision does not exclude any implied warranties. The scope of similar provisions has recently been defined by the Fifth Circuit. In Sperry Rand Corp. v. Industrial Supply Corp., supra, 337 F.2d at 371, the court said:

"As has been said, while there may be a valid express disclaimer of an implied warranty, the right to assert such a warranty is not precluded by express warranties which are not inconsistent, and since the implied warranty arises independently of the contract of sale, it is not to be rejected because of an integration clause. The contention of

Sperry Rand has been answered by the Supreme Court of Florida in saying:

'The fact that a contract of sale is in writing does not necessarily exclude warranties that may be implied by law; and where the alleged verbal warranty sought to be established is only what would be implied, evidence thereof does not change the legal effect of the contract, and is therefore admissible.' McDonald v. Sanders, 103 Fla. 93, 137 So. 122. Cf. Hoskins v. Jackson Grain Co., Fla., 63 So.2d 514."

*The Implied Warranty*

▇▇▇ There is no doubt that the hoses were unsuitable for use with the exotic fluids with which Beech was dealing. Beech needed the hoses for one purpose only—to transport UDMH and/or $N_2O_4$. Messrs. Hines and Krabbe as agents and Flexible as principal knew this. The knowledge of the agent within the scope of his agency will be imputed to the principal. Restatement of Agency, § 268, § 272 (1933); New York, N. H. & Htfd. R. R. v. Russell, 83 Conn. 581, 593, 78 A. 324 (1910); Hope v. Valente, 86 Conn. 301, 85 A. 541 (1912). Furthermore, these comments of the seller induced Beech to purchase. Thus, the buyer relied on the seller's skill in selecting the particular hose for use with its trailers. Without more there would be an implied warranty that the goods will be reasonably fit for this purpose. U. S.A. § 15 Conn.Gen.Stats. § 42–14. Truslow & Fulle, Inc. v. Diamond Bottling Corp., 112 Conn. 181, 151 A. 492, 71 A.L.R. 1142 (1930); Wallower v. Elder, 126 Colo. 109, 247 P.2d 682 (1952). It was ancient law in Connecticut, even before the enactment of the Sales Act, that such a communication to the seller by a buyer of a particular purpose for which a device is to be used will give rise to an implied warranty of fitness for a particular purpose. Pacific Iron Works v. Newhall, 34 Conn. 67 (1867).

▇▇▇ The seller argues that Beech merely purchased a standardized product

designed for no particular purpose.[7] Standard is a relative term. What is standard in the aerospace industry may not be standard in the household kitchen. Yet the concept implies a product which has moved beyond the zone of experiment into the arena of familiar use in the industry. In point of fact, these were no ordinary hoses. One does not make a $1500 hose out of teflon and silicon to pump water, milk or beer. But even assuming these hoses to be a "standard" item in the trade, the seller knew that the buyer intended them for a particular end use. If the particular purpose for which goods are to be used coincides with their general functional use, the implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability. Crotty v. Shartenberg's-New Haven, Inc., 147 Conn. 460, 464, 162 A.2d 513, 515 (1960). Recovery may be on either theory:

> "The particular purpose for which the goods are required, made known to the seller, may also be the general purpose for which the product was prepared and is commonly used. If so, there is an implied warranty that the goods are of merchantable quality. * * *" "A dealer who sells articles which ordinarily are used in only one way impliedly warrants fitness for use in that particular way. The warranty is one of merchantability." (147 Conn. at 464, 162 A.2d at 515).

Cf. 4 Williston, Contracts, § 989, p. 2721 (Rev. ed. 1936).

▉▉▉ Flexible further contends that this was a sale by sample[8] and that the goods conformed to the sample. The evidence reveals that the buyer may have seen the hose for a short time before purchasing and thereafter may have obtained a small piece of hose from Hines, however any such view was against a background of the seller's recommendations that the hose would work for the buyer's purposes. It is clear that mere exhibition of a sample to the buyer by the seller does not mean that the sale is by sample. Lindsey v. Stalder, 120 Colo. 58, 208 P.2d 83, 12 A.L.R.2d 519 (1949); Lockwood, Jr., Inc. v. E. Gross & Co., 99 Conn. 296, 122 A. 59 (1923); Lowenberg Co. v. Block, 140 N.Y.S. 375 (Sup.Ct.1913). And even if the sale be by sample, there may also coexist an independent implied warranty that the goods, as represented by sample, are fit for a particular purpose. John E. Smith's Sons Co. v. Lattimer Foundry & Mach. Co., 19 F.R.D. 379, 389 (M.D. Pa.), aff'd, 239 F.2d 815 (3d Cir. 1956).

The hoses were designed and sold by the seller to carry rocket fuel and oxidizer. This they could not do for any but extremely short times. With even moderate time exposure to these chemicals, the hoses cracked, leaked and discolored. When used with the oxidizer, the discharge hose severed entirely. Since, in the normal course of affairs, the hoses would be shipped with the trailers and used in the field, they were unfit for the purpose intended.

Defendant ingeniously argues that the fuel hose would have sufficed to fill or empty the fuel trailer 290 times and that the oxidizer hose would have done likewise on its trailer 95 times. These figures are arrived at, however, by taking the total time that the hoses were exposed to the chemicals and dividing this by the time required to empty or fill a

---

7. Professor Williston refers to the equivalent as "known, described and definite articles." 4 Williston, Contracts, § 990, p. 2724 (Rev. ed. 1936). A sale of this nature carries an implied warranty of merchantability, although it may preclude a warranty of witness for a particular purpose.

8. The warranty of correspondence of bulk with sample—which attaches to the use of a sample—is treated as "implied" under the Sales Act. U.S.A. § 16, Conn.Gen. Stats. § 42–15, Colo.Rev.Stats. § 121–1–16. By contending that the sale was by sample, carrying an implied warranty, does not the plaintiff concede that conduct and statements outside the acknowledgment may be looked to for implied warranties?

trailer. This calculation fails to take into account that in actual use the hoses would be stored overnight as well as while in transit after initial exposure to the chemicals. The deterioration progressed at approximately the same rate after initial exposure regardless of whether the chemicals were flowing through the hose or not. Due to permeating of UDMH or $N_2O_4$ through the teflon liner the hoses rotted in use and after use, day or night. Inasmuch as the Air Force was not going to fuel or unfuel a rocket continuously and since the deterioration proceeded regardless of use, the defendant's calculations in this regard are unrealistic and meaningless.

■ Defendant Flexible further argues that "incompatible" is a relative term and that the hoses were compatible with the extremely toxic and corrosive fuel and oxidizer, since they did not decompose immediately on contact. However, in view of the cost of each hose (from $500 to $1500 depending on size), it would be a commercial absurdity to treat a hose as though it were the equivalent of a paper cup or plate—disposable after a few uses. Consequently, the court finds that the hoses were not "compatible" in the ordinary and everyday understanding of that term.

Furthermore, the evidence reveals that the hoses were purchased for use with the trailers. They were not procured simply for the purposes of the test. It is conceded by Beech that it successfully tested the trailers with the hoses, even though the hoses failed to stand up. The cost of the hoses again refutes this "one use" theory as does the fact that twenty-four hoses were purchased, two for each trailer, although only two trailers were to be subject to extensive testing.

Consequently, the court finds the hoses were not "compatible" with either the fuel or the oxidizer. They were thus unsuitable for the particular purpose intended and unmerchantable in that they were designed for the same generic use for which they proved unsuitable. They failed to comply also with the express representations of Hines and Krabbe, agents of the seller, that the hose would be suitable for use in transporting the fuel and oxidizer.

Two further points must be considered: (1) the effect of Beech's use of certain hoses to test the oxidizer trailer after informing Flexible of its decision to reject and return all the hoses; (2) the scope of the acknowledgment clause limiting Flexible's liability to repair or replacement.

### Exercise of Rescission Rights

■ As to the first, the law requires that rescission for breach of warranty be sought promptly after discovery of the breach and that the buyer return the goods in substantially the same condition in which they were received. U.S.A. § 69, Conn.Gen.Stats. § 42–69, Colo.Rev. Stats. § 121–1–69. One who dallies in seeking rescission after discovering the defect and uses the goods after notice of rescission waives his right to rescind. Elwood Edwards, Inc. v. Kinsey, 123 Colo. 52, 225 P.2d 59 (1950); Olson v. Platt, 82 Colo. 10, 256 P. 635 (1927); Modern Homes Utilities, Inc. v. Garrity, supra, 121 Conn. 651, 186 A. 639. The buyer contends that its use of the hose was reasonable in that it was mitigating damages that might arise if the hoses caused it to lose its government contract. The principle of mitigation of damages is an old and honorable maxim of contract law. Restatement of Contracts, § 336 (1932); 5 Williston, Contracts, § 1353, p. 3795 (Rev. ed. 1936). When such mitigation involves damage to the goods of another, however, it is limited to reasonably necessary actions. The evidence has not revealed that great damages would surely occur to the buyer if it did not use these hoses. There was testimony that Beech could have procured substitute hoses within a matter of hours (Tr. p. 530) or at most within a few weeks. (Ex. 75). Consequently, I find that Beech's use of the hose after notice of rescission was not reasonably neces-

sary to mitigate probable future damages and such use thereafter constituted a waiver of its right to rescind. Elwood Edwards, Inc. v. Kinsey, supra, 123 Colo. 52, 225 P.2d 59. However, the contract was divisible and not entire. Beech will be denied the right to rescind only as to those hoses actually used in testing the oxidizer trailer.

### Limitation of Seller's Liability

 Secondly, the sentence limiting all liability to repair or replacement has traditionally been used to bar consequential damages. Morris & Co. v. Power Mfg. Co., 17 F.2d 689 (6th Cir. 1927). See Monarch Brewing Co. v. George J. Meyer Mfg. Co., 130 F.2d 582 (9th Cir. 1942). Such a clause bars rescission only where repair or replacement are *effective* to cure the breach. Cf. D'Orsay Equip. Co. v. United States Rubber Co., 302 F.2d 777, 780 (1st Cir. 1962). Where repair or replacement of individual parts is in its nature unsatisfactory and ineffective, a court will not be bound by a literal reading of the terms. Cf. Ford Motor Co. v. Cullum, 96 F.2d 1 (5th Cir.), cert. denied, 305 U.S. 627, 59 S.Ct. 89, 83 L. Ed. 401 (1938).

 On the facts present here, the "repair or replace" clause imposed an obligation of Flexible to return a hose to Beech that would successfully transport UDMH and $N_2O_4$ for an extended duration of time. This, Flexible could not accomplish in 1961. Consequently, the buyer is entitled to rescind and recover his purchase price.

 Nor does the 45 day notice provision bar rescission here. The hoses were shipped over a period of a month and a half—arriving from late March to early May. The relevant defect was latent in design and material, not obvious in construction. Extensive testing began in late May and the defect was discovered within a few weeks. The hoses were formally rejected on June 19, 1961. Except for the three hoses used by Beech to qualify the oxidizer trailer and for which it cannot rescind the sale, the other hoses were returned or attempted to be returned within a reasonable time.

 Apart from the 45 day clause, it is the law that rescission must be sought within a reasonable time [9] after discovering the defect. Lathrop v. Maddux, 58 Colo. 258, 144 P. 870 (1914). If the defect is latent this time runs from when the defect was or should have been discovered. Torrance v. Durisol, Inc., 20 Conn.Supp. 62, 122 A.2d 589 (1956).

 Here the buyer notified seller of its decision to rescind within a week or two after discovering a latent defect and within approximately two months after initial receipt. This would be, in the course of normal shipment, about 30–35 days after receipt. There was substantial compliance with the spirit if not the letter of this provision. The notice of rescission was made promptly after discovery of this latent defect. Since the defendant was unable to either repair or replace the hose the delay was wholly immaterial.[10]

### Fraud

Buyer also seeks rescission on the grounds of fraud. The buyer does not allege, nor does the evidence reveal an intentional misrepresentation by the seller. Flexible believed the goods to be suitable when it negotiated for the sale. Whether the later events gave rise to a

9. The rule as to what constitutes a reasonable time in which to reject the goods is different where the goods are perishable. In this case, a court will look favorably on a short time limit in which to reject. Cf. Hunt Foods, Inc. v. Gaer Bros., Inc., 88 F.Supp. 702 (D.Conn. 1949).

10. Compare the rule that a buyer seeking rescission for fraud need not make a tender or demand for rescission where it clearly appears that such would be unavailing. Bohe v. Scott, 83 Colo. 374, 265 P. 694 (1928).

duty to disclose on Flexible's part is a close and difficult question.

 It is the law in both Colorado and Connecticut that rescission will be allowed for false representations knowingly made. Keith v. Schuck, 68 Colo. 480, 190 P. 530 (1920). Cf. Ceferatti v. Boisvert, 137 Conn. 280, 77 A.2d 82 (1950). Rescission may also be allowed where the representation is in fact false although made in good faith by the seller. Lathrop v. Maddux, supra, 58 Colo. 258, 144 P. 870.

 Where a seller represents what is true at the time and this fact later becomes untrue, there is some support for a duty to disclose this substantial change of material circumstances. This is so when material representations, true when made under an executory contract, become false before the execution of the bargain. Loewer v. Harris, 57 F. 368 (2d Cir. 1893).

Professor Williston says:

"And one who, after making an innocent misrepresentation, discovers the truth yet thereafter silently allows another to act on the misrepresentations is guilty of fraud. The consequence is the same though the original representation was true when made." 5 Williston, Contracts, § 1497, p. 4181–82 (Rev. ed. 1936).

Further: "So it now seems clearly settled that there is a duty upon a seller to disclose to a buyer the fact that material representations, true when made, have become false before final consummation of the sale." Id. at § 1499, p. 4187.

There is, however, no evidence that Flexible was clearly aware that the twenty-four hoses were unsuitable before they were received and accepted by Beech. The Jennings studies in March were honestly believed by Flexible to be inconclusive. Richitelli's report (Ex. 25) supports this belief. The tests being conducted by Beech for Martin reveal that Martin had not decided conclusively to reject all the hoses as unsuitable. Also Beech would be as well aware as Flexible of any results of any of these tests.

 There is some evidence that Flexible through McPherson was aware of the fact that the hoses were unsuitable as of June 8, 1961, the date of the Clark-McPherson phone call. By this date, however, Beech had accepted the twenty-four hoses. The contract was executed as to these. As to the spare hoses, there never was any contract since the hoses were rejected on receipt and Flexible's counteroffer remained unaccepted. Fraud need not be considered in this context. There is no evidence that Flexible was aware that the hoses were unsuitable on any particular date before June 8th. Fraud must be proved by clear and convincing evidence. 9 Wigmore, Evidence, § 2498 (3d ed. 1940). The evidence here does not clearly support the allegation of fraud.

### Interest

 The buyer also seeks interest on the amount due it as a refund of the purchase price, dating from September 8, 1961, the date of demand for refund. Such interest is recoverable under both the law of Colorado and the law of Connecticut. If a Connecticut court would look to the law of Colorado for allowance of interest, Colorado allows interest at 6% "on money due on account from the date when the same became due * * *." Colo.Rev.Stats. § 73–1–2. See Donley v. Bailey, 48 Colo. 373, 110 P. 65 (1910). The statute has traditionally required the allowance of interest on liquidated claims. North Drive-In Theatre Corp. v. Park-In Theatres, 248 F.2d 232 (10th Cir. 1957). The mere fact that the claim is in dispute does not preclude the recovery of interest. T. & M. Transp. Co. v. S. W. Shattuck Chemical Co., 158 F.2d 909 (10th Cir. 1947). The refund of the purchase price sought here through rescission is a liquidated amount. The denial of rescission as to three hoses does not render

the amount unliquidated; the purchase price of each hose is clear and ascertainable.

If Connecticut would apply the law of the forum the result would be unchanged. Interest is allowed by Connecticut at 6% a year "as damages for the detention of money after it becomes payable." Conn. Gen.Stats. § 37–3. The sum sought here is liquidated. Interest is accordingly allowed in this case. Cf. L. Albert & Son v. Armstrong Rubber Co., 178 F.2d 182, 17 A.L.R.2d 1289 (2d Cir. 1949) (L. Hand, J., applying Conn. law); Healy v. Fallon, 69 Conn. 228, 37 A. 495 (1897).

Beech is entitled to interest at 6% on the amount of its refund from the date of demand and Flexible is entitled to interest at 6% on the admitted debt of $2,078.40 from the date of each invoice.

### Conclusion

The buyer, Beech, is entitled to recover the purchase price paid minus the price of the three hoses used to qualify the oxidizer trailer. Although the list price for the twenty-four hoses was $24,378.00, the buyer paid only $23,616.45. The term 1% 10, Net 30 on the documents does not explain this differential. Since the buyer has failed to inform the court as to the discount system employed, the court will subtract the list price of two four inch hoses and one two inch hose ($3,880.00) less 1% from the total price paid of $23,616.45. The buyer is accordingly entitled to $19,775.25 plus interest at 6% from September 8, 1961.

Flexible is not entitled to the purchase price on the spare hoses, since the seller's counteroffer on these hoses was never accepted by Beech. Flexible is entitled to the $2,078.43 on its admitted counterclaim plus interest at 6% from the date of each invoice.

Each party will bear its own costs.

So ordered.

This opinion constitutes the court's findings of fact and conclusions of law in compliance with Rule 52, Fed.R.Civ.P.